THOMAS SAUNDERS v. THE STATE.

1. The science of surgery has not yet established rules by which can be determined, with certainty, the direction which a bullet will take after entering a human body. See the opinion in this case for a discussion of the deflections to which such missiles are subject.

2. The accused being on trial for murder, and there being no witness to the killing, the principal was his own statements of the affair. He said that the killing was done by the accidental discharge of his pistol, and illustrated the manner and angle at which he held his pistol at the moment. To discredit this statement and show design, the prosecution introduced witnesses to the direction pursued by the bullet after it entered the deceased's head, and who testified that the pistol could not have been held as stated by the accused. On this testimony, accompanied with evidence of the frivolous and profane conduct of the accused soon after the killing, he was convicted of murder in the first degree, and his motion for a new trial was overruled by the court below. *Held*, that such evidence was of too indeterminate a nature to exclude reasonable doubt of the guilt of the accused; and therefore it was error to refuse a new trial.

APPEAL from Collin. Tried below before the Hon. W. H. Andrews.

The opinion of the court sufficiently states the case.

*Walton & Green*, for the appellant, filed an interesting and very able argument, reviewing the facts at length.

*William Alexander*, *Attorney-General*, for the State. Appellant was indicted for the murder of James Huffhines; was found guilty of murder in the first degree, and the punishment fixed by the jury was death. He moved for a new trial, but the court overruled the motion, and he appealed to this court, assigning as error the overruling of his motion for new trial.

That motion was based upon two grounds. First, that the verdict of the jury is contrary to the law; and second, that the verdict of the jury is contrary to the evidence; and as there is no difference of opinion between counsel for the State and for

the appellant as to the law of. the case, the simple question
before this court is that presented by the second ground for
motion for new trial : " is the verdict of the jury contrary to
" the evidence ? "

In the examination of this case, this court will probably feel
itself at liberty to extend its inquiry further than the sugges-
tion of the motion, and will look to see, not only if the ver-
dict is *contrary* to the evidence, but if it is *unsustained* by evi-
dence; and it is frankly conceded that this is the duty of the
court.   But it is at the same time suggested, with all respect,
that if the court should feel itself at liberty to overstep this
safe rule, and proceed to examine as to the *sufficiency* of the
evidence to support the verdict, there is danger of trenching
upon the province of the jury; and the court, in so doing, will
enter upon a boundless field, where all limit is lost sight of.

" It is the appropriate province of the jury to weigh the
" evidence; and unless it appears that their finding is *against*
" the evidence, this court has invariably refused to disturb the
" verdict; the rule being the same in criminal, as in civil cases."
(Shaw *v.* The State, 27 Texas, 757 ; Seat *v.* The State, 28
Texas, 497 ; Cox *v.* The State, 32 Texas, 610.)

Without entering into a minute examination of the testimony
in this case, it may be said that the State made out a *prima
facie* case of killing against appellant, by the testimony of the
wife of the deceased alone, without the aid of the admissions
of the accused, and thereupon arose the implication of malice.
Every homicide is, in law, murder in the second degree, until
either the State, by proof of express malice, enhances it to
murder of the first degree, or the accused, by proof of explana-
tory or exculpatory circumstances, reduces it to an inferior
grade. (7 Gray, 584.)   The burden of proof, in the former
case, is upon the State; in the latter, upon the accused; and it
is singular, yet true, that both the State and the accused rely
largely on the statement of the accused, to support their re-
spective positions.   The State finds there proof of malice, in
the facts of the accused having enticed the deceased from the

house by a false pretext, and the absolute falsity of his account of the manner in which the shooting occurred; while the accused insists, very properly, that if his admission that the killing was done by his hand is to be used as proof against him, it must be received with the accompanying explanation in his favor. The whole of his statement must be taken together. But the jury exercised the right (clearly theirs by law) of believing so much of his statement as appeared to be true, and consonant with the other circumstances of the case, and of rejecting so much thereof as to them appeared to be false, and unsustained by those circumstances. " It is not to be supposed " that all the parts of a confession are entitled to equal credit. " The jury may believe that part which charges the prisoner, " and reject that which was in his favor, if they see sufficient " grounds for so doing. If what he said in his own favor is " not contradicted by evidence offered by the prosecutor, nor " improbable in itself, it will naturally be believed by the jury, " but they ＊ ＊ ＊ ＊ ＊ are at liberty to judge of it like " other evidence, by all the circumstances of the case." (1 Greenleaf's Ev., Section 218.)

In this case, the jury rejected his explanation. They found it a statement that while the accused was holding his pistol before him at an angle of 45°, it went off accidentally, and shot the deceased in the back; and they further found evidence, that the wound thus inflicted was in the head, and was a horizontal one, or, if deflected from the horizontal, turned somewhat downwards; a physical impossibility in the relative position of the parties as shown by the statement.

Again, the verdict is impeached for want of evidence of sufficient motive for the crime.

It is true that the evidence on this point is scanty, but not so much so but that the jury might infer a motive. It is in evidence that the accused knew the purpose with which the deceased visited Dallas the day before, and that he might possibly bring nine hundred and fifty dollars with him on his return; that he knew deceased brought some money with him, but no evidence

that he knew of the failure of deceased to get the whole. The jury might, most probably did, from these facts, infer a motive ; nor does the want of proof of acts done by the accused, in furtherance of such a design—such as searching for the money, etc., overthrow the inference. What occurred between the accused and the deceased at the time of the fatal shot, and during the ten or fifteen minutes when appellant went out the second time, is unknown to any human being save himself ; but he had ample opportunity for searching the person of deceased for the money. Be that as it may, when a deliberate murder is ascertained, the law will presume a motive, and so did the jury.

WALKER, J. The appellant was indicted for the murder of James Huffhines ; he was tried, and convicted of murder in the first degree, and sentenced to suffer the death penalty.

The principal evidence for the State is that furnished by Saunders himself. His statements make the killing of Huffhines purely accidental. It appears from the evidence that Saunders was hired to the deceased ; that he was accustomed to work with, and take care of horses ; and had, whilst working for Huffhines, and also when employed by another person, been in the habit of getting up in the night, and going out to look after the horses in his care, under some real or imaginary alarm of a disturbance of the horses by persons intending to steal them. On the night of the 28th of December, 1871, he called Huffhines to go out with him to look after the horses. He pretended to have seen some person on the premises. Saunders and the deceased went out together, Saunders having a pistol. Whilst out a short distance from the house Huffhines was shot, and died from the wound.

The account given by Saunders of the shooting is, that Huffhines was walking before him ; that they were returning to the house ; that he had cocked his pistol, and was attempting to let the hammer down to the rest, holding the pistol in his hands, at an angle supposed to be about 45°, from his manner of illus-

trating the position of the weapon in his hands; that the hammer slipped from under his thumb, causing an accidental discharge of the pistol, the ball, as he supposed, striking the deceased in the back. This, however, was not the case; the testimony shows the ball entered the head of the deceased about the base of the occipital bone, penetrating about two inches in a downward range towards the chin.

The State has adopted a theory favored by the evidence of professional witnesses, inconsistent with the statements of the appellant, which appears to be predicated that the direction of the ball after it entered the head of the deceased, must necessarily have followed the prolongation of a straight line from the point at which it was discharged from the pistol. This theory, if true, to account for the depression in the line of direction pursued by the ball after entering the man's head, would establish the fact that the ball must have been fired from a point higher than the head of the deceased, which might perhaps involve the case in speculation if not in absurdity. At all events, it is inconsistent with the idea that the pistol was held in the ordinary position in which such weapons are held when aimed at an object, if the theory of the State be correct.

But, after having examined some authorities of very high standing on gun-shot wounds, and particularly the reports of surgeons employed in the field and base hospitals during the late war in the United States, we are perfectly satisfied that to whatever degree of perfection the noble science of surgery may have been brought, no rules have ever been laid down or attempted, to establish the geometrical direction of war missiles, after entering the human body. Where bodies of equal density, and of spherical form (as in case of the ivory balls used in the game of billiards), are brought in contact, they will separate on the geometrical principle that the angle of incidence is equal to the angle of reflection. This, however, depends upon the condition that the cue, by which the moving ball is forced, shall strike precisely upon its centre—the skillful player well understanding how to produce or avoid this result. Many il-

lustrations might be given of this principle on the billiard table.

But, when bodies of unequal density and different in form, are brought in contact by equal or unequal forces, the principle by which they will be deflected depends upon so many conditions as to have so far utterly baffled any law which science has established. There are plenty of living men who could upon their own bodies illustrate the erratic and utterly uncertain direction of gun-shot wounds, by a simple reference to the wound of entrance, and the wound of exit. A ball passing through the atmosphere under a diminishing force, will be deflected more easily than one flying with a full velocity of its exit from the muzzle of the piece from which it is discharged. Many instances are found where partially spent balls, entering merely the muscular parts of the human body, have traversed a line varying many degrees from the line upon which they entered the body. The most remarkable and singular results are often witnessed, where leaden balls come in contact with the tough sinewous cartilages or ossified parts of the human body. Nevertheless, it is true that the conical balls used in modern warfare, when passing through a line of any direction with great velocity, and brought in contact with substances of less density, will pass forward on a straight line for a short distance, unless the form of the object be such as to exert an unequal resistance on the striking surfaces.

We feel sure we are authorized in these remarks, by the experience and scientific observation of every author who has treated the subject, and especially those who have written from personal observation. We do not feel authorized in a legal opinion to enter at length into mere scientific speculations. But we think in this case, we are called on to deduce from science as far as it goes, and from known facts and principles, whatever can be so legitimately deduced in favor of innocence and human life.

The State offered in evidence the testimony which the appellant furnished against himself, and then, taking everything for

granted which would fix the guilt of the appellant, those parts of his statement which would imply his innocence are attacked by the evidence of surgeons whose statements, we believe, have been allowed an undue force by the jury. No member of the profession whose experience has extended to this class of cases, need be admonished of the danger of relying too much on the opinions of experts.

No doubt the jury gave great weight to the most singular conduct of the appellant, at and about the time of Huffhines' death. Evidently he is a man of very obtuse sensibility, low in language and in thought, apparently indifferent to the terrible scene before him ; but is there any evidence of guilt in this ? There is certainly no affectation of sensibility, no tears, real or simulated, no false or real compassion shown for the bereaved widow, no evidence whatever from the manner of the man, of guilt ; bystanders would unhesitatingly have pronounced him void of all sense of propriety, and lacking in any proper appreciation of surrounding circumstances, whether guilty or innocent. But who will say that because he used profane language, sang, or even danced, on the day of the funeral, that these are indices of guilt ? Sound and acute observation teaches us that a guilty man, at least of ordinary mind and intelligence, having confessed to the accidental killing of his friend and employer, would have simulated, at least, some concern for the family of the deceased, or regret for the accident. In most cases this line of conduct would have been adopted even with ostentation.

But the State has also a theory of this case, that Saunders killed Huffhines for his money. But no money is missed from the body of the dead man ; the house is not robbed ; indeed, the evidence tends strongly to show that Saunders knew Huffhines had little or no money in his possession at the time of his death. We do not think the evidence sustains this theory of the case.

We have twice very carefully examined this record, and the case has been argued with great ability to the court, and we

feel that we should be doing great wrong in taking away the life of a human being upon doubtful and uncertain evidence, were we to affirm this judgment. We regard it as one of those cases where the law has been violated, in not giving the accused the benefit of those grave doubts which must rest upon every well-informed mind that has attended to all the evidence in the case.

We therefore reverse the judgment of the District Court, and remand the case.

Reversed and remanded