MIRTEL G. TOMLINSON, Appellee, v. SOVEREIGN CAMP OF WOODMEN OF THE WORLD, Appellant.

**Insurance:** CAUSE OF DEATH: PRESUMPTION: SUICIDE: BURDEN OF PROOF. Upon proof of death the presumption arises that it was accidental rather than suicidal, or with felonious intent at the hands of another; and an insurance association claiming that a member committed suicide has the burden of overcoming this presumption and proving suicide to defeat recovery by a beneficiary, under a provision of the contract by which death by suicide would render the certificate null and void.

**Same:** SUICIDE: EVIDENCE. In this action upon a fraternal benefit certificate to be void upon the member committing suicide, the evidence is reviewed and held sufficient to support a finding that the member did not commit suicide.

**Same:** EVIDENCE: ADMISSIBILITY. In an action upon a benefit certificate designating a sister as beneficiary, in which it appeared that the deceased was married shortly before his death, evidence that he had declared his intention to change the certificate making the same payable to his wife was admissible, as tending to show that he had regard for her and as precluding the idea of trouble with her, which might have furnished a motive for the alleged suicide.

**Same:** SUICIDE: EVIDENCE. Where suicide was pleaded as a defense to an action upon a benefit certificate, admission in evidence of the coroner's verdict, over plaintiff's objection, which *prima facie* showed that deceased committed suicide was not prejudicial to defendant.

**Same:** INSTRUCTION. An insurance association alleging in defense to an action upon a benefit certificate that deceased came to his death by suicide has the burden on that issue throughout the trial; and even though a coroner's verdict finding death by suicidal means constituted *prima facie* evidence of that fact, still it was not conclusive on the subject and did not shift the burden of proof.

**Same.** In determining whether a deceased member of a fraternal association came to his death by accidental or suicidal means the jury should consider all the facts surrounding the death; his disposition, financial and domestic relations, the character and location of the wound, the location of the body when found and other facts bearing upon the issue.

**Same:** REQUESTED INSTRUCTIONS: REFUSAL.  It was not erroneous to refuse an instruction when the proposition involved was fully covered by the charge as given by the court, and the request if given might have been misleading.

**Same:** BURDEN OF PROOF: INSTRUCTION.  Where an insurance association sought to avoid liability on the ground of suicide and made a *prima facie* case by the introduction of the coroner's verdict to that effect, which it attempted to support by oral testimony, the jury was correctly instructed that in determining whether defendant had overcome the burden of proving suicide it should not only consider the *prima facie* case made by the coroner's verdict, but also the legal presumption favorable to plaintiff that death is accidental, and also the entire testimony bearing upon the manner of death.

*Appeal from Madison District Court*—Hon. W. H. Fahey, Judge..

Thursday, June 5, 1913.

Action at law upon a certificate of membership, issued by the defendant, a beneficiary society, to Ralph V. Collier. By the terms of the certificate, defendant agreed to pay to Mirtel G. Tomlinson, a sister of the insured, the sum of $500 in case of death of the member within one year from the date of the certificate; $750 in the event it occurred during the second year; and $1,000 in the event it occurred after the second year. Collier died within one year, and this action is to recover the sum of $500. By the terms of the certificate, it was provided that should the member die by his own hand or act, whether sane or insane, the certificate should be null and void, and all payments made the society should be forfeited to it. Defendant pleaded that Collier committed suicide, and that nothing was due the beneficiary named in the certificate. Upon this issue the case was submitted to a jury, resulting in a verdict and judgment for plaintiff, and defendant appeals.— *Affirmed.*

*Frank H. Dewey* and *Leo C. Percival,* for appellant.

*Robbins & Nicholson,* for appellee.

DEEMER, J.—I. The sole issue in the case was whether or not Collier, the insured, committed suicide; for death from a pistol shot was either expressly admitted or conclusively shown.

Upon such death being shown, a presumption arose that the death was accidental, rather than suicidal or with felonious intent by the hand of another. This,

1. INSURANCE: cause of death: presumption: suicide: burden of proof.

of course, is not a legal presumption, but rather a presumption of fact, or inference, which is to be drawn from the fact that men do not, as a rule, commit suicide; and a felonious homicide is not presumed even where a man is found dead with a bullet hole in some vital part. It is a rebuttable presumption and, in cases like the present, casts the burden upon the defendant of showing that the wound which caused the death was self-inflicted or suicidal in character. The certificate covers death of the insured, no matter whether accidental or not; but provides that it shall be null and void in the event the insured came to his death by his own hand or act, whether sane or insane. So that the policy is somewhat different from those insuring against death from accident alone.

The case was submitted to the jury for it to determine whether or not the death was suicidal; the burden being properly placed upon the defendant. *Stephenson v. Association*, 108 Iowa, 637; *Metzradt v. Brotherhood*, 112 Iowa, 522; *Tackman v. Brotherhood*, 132 Iowa, 64; *Van Norman v. Brotherhood*, 134 Iowa, 575; *Mittelstadt v. Modern Woodmen*, 143 Iowa, 186; *Connell v. Traveling Men's Ass'n*, 139 Iowa, 444. The jury returned a verdict for the plaintiff, evidently concluding that defendant had not met the burden cast upon it.

For a reversal of the judgment, appellant relies upon four or five propositions; the main one being that the verdict is without sufficient support in the testimony, or, rather, that defendant had conclusively shown that the wound which caused the death was self-inflicted.

II. The certificate was issued on December 22, 1910, and

Collier came to his death from a pistol shot wound, in the city

2. Same: suicide: evidence.

of Des Moines on June 22, 1911. Collier lived at Peru, or East Peru, in this state, when admitted to membership in the defendant society, and but a few days prior to his death had been at Lorimor, also in this state, for the purpose of buying a restaurant. While there he met one Higgins and talked with him about the matter. For some reason the two men concluded that they would go to Des Moines, and they took the train at Lorimor for the capital city, the train leaving some time in the evening of June 21, 1911. Arriving at Des Moines, they went to a hotel and slept together that night. They were together again the next day, and during the afternoon sat down together in the shade of the county courthouse. The day was very hot, and Collier asked Higgins if there wasn't a cooler place where they might rest, to which Higgins responded that there was better shade down the street; pointing to a place where there were some trees. This was across the railway tracks, south of the courthouse, and to that place they repaired. Finding a tree, they lay down, with their heads close together under its protecting branches, and both went to sleep. Higgins was disturbed in his slumber and awakening saw Collier standing at his head. He asked him what he was doing and Collier said he thought he would get a little more air. Higgins again dozed off, and was again aroused by the report of a gun, and as he raised up he touched Collier and remarked that they had better get out of there, as he had heard some shooting. Smelling powder and getting no response from Collier, Higgins turned around and for the first time discovered that Collier had been shot, for he observed the blood streaming from a wound in the temple. The wound was made with a .32 caliber revolver and the bullet had taken a downward course and lodged just about the hair line at the back of the head, and a little to the left. Having discovered the wound, Higgins immediately started in search of a policeman, and finding one in a very short time, he reported the matter and

the policeman called a patrol wagon, which soon arrived with the city physicians, and they, in company with Higgins, went back to where Collier was lying, finding him reclining upon his back with blood flowing from the wound. Collier's coat was partially rumpled up under him, his right hand was under his body, and when the body was lifted from the ground, a revolver was found lying just below the right hip. This revolver was not discovered until the physicians had lifted the body and put it on a stretcher. The revolver was a five-chambered cheap type, and when picked up had one empty and four loaded shells in it. There is a dispute in the testimony as to whether or not there were any powder marks around or in the wound, or any burning of the hair, and a jury might have found either way on this proposition. Collier never regained consciousness and died shortly after reaching the hospital.

He was of a jovial disposition, his family relations were pleasant, and he had no financial difficulties—indeed at this time he had money in the bank, although during this last trip he ran short of funds and wanted Higgins to cash a check for him. This Higgins refused to do, saying that he (Higgins) had enough money to get them both home. He had never been out of work, was in good health, and no possible motive is suggested for committing suicide. He had never, so far as known, owned or carried a revolver prior to the day of the accident, and, so far as shown, had no familiarity therewith. He was intending to go home with Higgins on the day he was shot.

There is no testimony that either of the men was intoxicated, and no motive is shown for Higgins shooting him. Higgins was taken in charge by the police, who searched him, finding $1.60 upon his person, but no weapon of any kind and there was no testimony that either the body or clothing of Collier had, in any manner, been disturbed after he was shot. The tree under which the men lay down was unobstructed and there were no buildings or other screens nearby.

Higgins was retained until after a coroner's jury had been called and returned a verdict finding that the wound was inflicted by Collier with suicidal intent. He remained about Des Moines for two or three days and then returned to his home at Lorimor. The only other testimony of any consequence is that when Collier was discovered and examined by the officers and physicians, there were powder burns, or evidence of powder smoke, on the front of the right forefinger, between the end and the middle joint, and some of the testimony tended to show that there were more powder marks forward and above the bullet hole in the skull, than below it.

There was also some testimony to the effect that Collier said he had a gun a day or two before he started for Des Moines, and perhaps the day he started; but no one saw any gun about his person until after he was fatally wounded, when it was found as before indicated. Over defendant's objections, plaintiff was permitted to show that Collier was married on May 10, 1911, and that he told his wife and a Mr. Wilson that he intended to change the beneficiary named in his policy from his sister, the plaintiff herein, to his then wife. This wife testified that there had never been any trouble between herself and husband, but the record discloses that she had a child by him, which must have been conceived before the marriage.

The verdict of the coroner's jury was received in evidence, the only objection thereto being: "The defendant objects to the introduction of the record without the introduction of all the proceedings and the evidence taken in connection with the inquest held at that time."

From this record, it is apparent that Collier might possibly have met his death in one of three ways: (1) Through suicide, (2) by an accidental discharge of the pistol while in his own hand or in the hand of Higgins, and (3) feloniously by the hand of Higgins. If by either of the two latter methods, the defendant is liable; if by the first, the defendant is not liable.

The writer is of opinion that a finding by the jury that Higgins intentionally inflicted the wound, with felonious or unlawful intent, would not have sufficient support in the testimony, and, if it could reasonably be said that this was the theory on which the verdict was returned, it would be our duty to set the same aside. But, as no special findings were returned, it cannot be said that this was the basis of the verdict. The majority of the court are of opinion, however, that even if the verdict were based upon that ground it would have sufficient support in the testimony, due to the fact that it was for the jury to say whether or not the wound was feloniously inflicted by another. We are all agreed, however, that upon the facts disclosed by the record there was enough testimony to justify a verdict for the plaintiff, on the theory that the wound was accidental and not self-imposed with suicidal intent. In addition to the presumption of accidental death, there is affirmative testimony showing lack of motive for self-destruction; and no evidence whatever of insanity or any form of mental derangement. Again, it is shown that he was free from care or trouble of any kind, jovial in disposition, and never morose or melancholic. He was planning for the future and intending to return to his home the very afternoon he was shot. The weapon he had was a cheap one and it was not shown that he was familiar with the use of firearms; indeed, such testimony as there is on this subject showed unfamiliarity with revolvers. He was thinking of how he would get the money on which to get home and suggested the cashing of a check, when Higgins announced that he had enough to take them both home. About a month before going to Des Moines, he indicated a thoughtfulness of his family and a desire to change the beneficiary in his policy from his sister to his wife. He was not harassed in any manner, and the record shows affirmatively that his relations with his then wife were pleasant and harmonious. The record of fatalities from the accidental discharge of firearms is so great that neither courts nor juries can shut their eyes

thereto; and in weighing testimony in such a case as this, it is legitimate to consider the dangers attendant upon the careless handling of firearms, even by those who are supposed to be familiar therewith.

Appellants say that the physical facts—as the course of the bullet, the powder marks and burns upon the head, the powder marks upon the finger, and some other circumstances—clearly show that the wound was inflicted by Collier with suicidal intent. In the first place, it should be said that there is a dispute regarding the powder marks and burns upon the head, and, again, it cannot be assumed either as a matter of law or of fact that one who commits suicide holds a revolver in any particular way. Especially is this true where, as in this case, no one can tell whether Collier was standing, lying, or reclining upon the ground when the weapon was discharged.

Counsel for appellant contend that from the testimony as to powder marks and burns, it must be inferred the revolver was held from two to six inches away from the head and that the course of the bullet was such as that it could not, in all human probability, have resulted from an accident. Regarding the first proposition, the fact that the pistol must have been held some distance away from the head in order to produce the results which were discovered is more significant of accident than of suicide; for, if we have not been misled in our reading, the suicide generally places the weapon against the head or body when he fires, instead of holding it some distance away from the person. Moreover, the line followed by the bullet is very unsatisfactory testimony, for it is subject to deflection by very slight obstacles, and the size of the bullet and quality and quantity of the powder must also be taken into account. *State v. Morphy,* 33 Iowa, 270; *State v. Porter,* 34 Iowa, 131; *People v. Westlake,* 62 Cal. 303; *Saunders v. State,* 37 Tex. 710. Most of the books say that in cases of suicide, the weapon will be found firmly grasped in the hands of the deceased. Again, the course of

the bullet may depend upon how the head was held at the time of the shooting, and if, as defendant here contends, the revolver must have been held so that the bullet went directly into and straight across the head, it would seem that if discharged with suicidal intent the revolver must have been held from two to six inches away from the head and the head inclined to the right, so that the position of the gun, if held in the right hand, must have been quite awkward. There is nothing in the physical facts which shows that the wound could not have been accidentally inflicted.

To our minds, the verdict has sufficient support in the testimony based upon the theory of accidental death.

III. Complaint is made of the testimony of Mrs. Collier, regarding her husband's declared purpose to change the beneficiary named in his certificate. In view of his recent marriage to this woman, and the possible inference which might be drawn of trouble between them, we think this testimony was admissible as tending to show that he had such regard and affection for his wife as to preclude the idea of trouble with her, which might, perhaps, have furnished a motive for suicide. Again, it might have been given weight as bearing upon the question as to whether or not he would commit suicide until he had the policy so changed that his wife might be the beneficiary. At any rate, the testimony was nonprejudicial in character, even though it did not logically tend in the directions already indicated.

3. SAME: evidence: admissibility.

IV. The objection made to the coroner's verdict must have been interposed by plaintiff's counsel, although the record is apparently to the contrary. This court has heretofore held such testimony admissible. *Metzradt v. Brotherhood,* 112 Iowa, 522. And, whatever may be thought of this rule by the court as now constituted, the defendant suffered no prejudice from the admission thereof, and the objection which was interposed came from plaintiff's counsel and not from defendant.

4. SAME: suicide: evidence.

Defendant's counsel say that this made out a *prima facie* case, and that the testimony was not such as to overcome this *prima facie* showing.   The trial court gave the following instruction with reference thereto:

8. The verdict of the coroner's jury as to the inquest held upon the body of Ralph V. Collier at the time of his death, has been offered in evidence upon the trial of this cause.   This evidence is competent and should be considered by you as bearing upon the question of whether the death of Ralph V. Collier was by accidental or suicidal means.   This verdict, standing alone, would be *prima facie* evidence that his death was caused by suicidal means, but such verdict is not conclusive; and the actual manner in which he did meet his death may be inquired into by you, and determined by a preponderance of the evidence before you, bearing in mind also the presumption of his death being accidental, together with all the other facts and circumstances surrounding the manner of his death by all the evidence introduced upon the trial of this cause.

*(margin: 5. SAME: instruction.)*

This was as favorable to defendant as it was entitled to under any view of the record.   If it be said that the *prima facie* showing, made out by the coroner's verdict, overcame the presumption that the death was accidental, the case still stood upon the testimony *pro* and *con* with the burden, at all times, upon the defendant to prove that the wound was suicidal in character.   That burden never shifted although, perhaps, the presumption arising from time to time required either side to proceed to meet these presumptions as they obtained, first on one side and then upon the other.

V.   The trial court also gave the following instruction:

9. As bearing upon the question as to what was the cause of the death of Ralph V. Collier, that is, as to whether the same was suicidal or not, it would not be proper for you to base your verdict upon mere *conjecture or speculation, nor should you base your verdict upon mere* possibility, but it is proper for you to consider all the facts and circumstances surrounding his death; his dispo-

*(margin: 6. SAME.)*

sition, his financial condition, his domestic relations, the character and location of the wound upon his body, the location of his body at the time he was found, soon after the receiving of the said injury, and from all these facts and circumstances, and all other facts and circumstances developed by the evidence in the case, and from the necessary and reasonable inferences which you, as reasonable men, draw from the facts and circumstances developed by the evidence in this case, you should determine whether the said Ralph V. Collier's death was or was not caused by suicidal means.

Our conclusion with reference to the complaint made of this instruction has already been forecasted. There was no error therein of which defendant may justly complain, unless, as defendant contends, there was no question to submit to a jury. That proposition we have already disposed of adversely to his contention.

In this connection, complaint is made of the refusal of the court to give the first instruction asked by the defendant. This read as follows: "I. In deciding this case you

7. SAME: requested instructions: refusal.

must confine yourselves strictly to the evidence offered in this case as disclosed by the testimony and circumstances developed on the trial of this case and upon nothing else, and in arriving at your verdict you are not permitted or allowed to base the same on mere conjecture or speculation, nor should you return a verdict based upon a mere possibility. In matters of proof you will not be justified in inferring from mere possibilities, the existence of a fact." The one given by the court covered this proposition as fully as the case required, and to have given the one requested, without some qualification, might have misled the jury to plaintiff's prejudice.

VI. Complaint is made of the seventh instruction, because the trial court said therein, among other things: "And in this case, the presumption is that the death

8. SAME: burden of proof: instruction.

of Ralph V. Collier was not suicidal, but was an accident." This is the rule sustained by all the authorities. See cases cited in the first division of

this opinion. No other point is made against this instruction, and we have no occasion to pass upon its correctness as a full exposition of the law upon the subject. It is said, however, that taken in connection with the eighth, which we have already quoted, the instruction was erroneous, for the reason that the trial court should have instructed that the coroner's verdict overcame the presumption of accident, and that no reference should have been made in the eighth instruction to the presumption of accident, because it was overcome by the *prima facie* showing, arising from the coroner's verdict. Even if this were the case, which we concede arguendo, the burden was upon the defendant to show that deceased committed suicide, and this burden it undertook to discharge by assuming it during the trial. It introduced the coroner's verdict in evidence, and also attempted to support it by oral testimony. Doubtless this verdict standing alone made out a *prima facie* case for defendant, but it was not conclusive, and had defendant stood upon it he might have been defeated by the mere presumption that the death of Collier was accidental, for defendant had the burden on this issue. Having made its case, a presumption or legal inference arose for the plaintiff, and this was supplemented by other proof. In determining then, whether or not the defendant had met the burden imposed upon it, the jury was instructed to consider, not only the *prima facie* case made by the coroner's verdict, but also the counter presumption arising for the plaintiff, and also the entire testimony showing how the death occurred.

As the burden was upon the defendant and did not shift during the entire trial, and as a *prima facie* case may or may not overcome a presumption in favor of the other party, we think there was no error of which defendant may justly complain. Cases holding the verdict of a coroner's jury admissible in a civil case to prove the manner of death, are quite numerous. See 1 Greenleaf on Ev. (15th Ed.) section 556; *Pyle v. Pyle,* 158 Ill. 289 (41 N. E. 999); *Grand Lodge v. Wieting,* 168 Ill. 408 (48 N. E. 59, 61 Am. St. Rep. 123);

*Supreme Lodge v. Fletcher*, 78 Miss. 377 (28 South. 872, 29 South. 523) ; *Walther v. Insurance Co.*, 65 Cal. 417 (4 Pac. 413) ; *Insurance Co. v. Newton*, 22 Wall. 32 (22 L. Ed. 793). Although there are many cases to the contrary, none of them go to the extent, we think, of changing the burden of proof, unless it be the English case of *Prince of Wales v. Palmer*, 25 Beav. 605. If that case goes to the extent claimed, it is, to our minds, clearly unsound in principle and unsupported by authority. See, as sustaining our rule, *Dufree v. Railroad Co.*, 155 Iowa, 544. The instructions as given have direct support in *Mittelstadt v. Woodmen*, 143 Iowa, 188.

No prejudicial error is shown, and the judgment must be and it is *Affirmed*.