C. O. WILKINSON, Administrator, Appellant, v. NATIONAL LIFE ASSOCIATION, Appellee.

**INSURANCE:** Actions on Policies—Suicide—Directed Verdict. An insurer is not entitled to a directed verdict on its defensive plea of suicide unless the facts and circumstances preclude every reasonable hypothesis except that of suicide. Evidence held insufficient to overcome presumption of non-suicide.

DE GRAFF, C. J., dissents as to the effect to be given to instant testimony.

**INSURANCE:** Actions on Policies—Evidence—Verdict of Coroner's Jury. The verdict of a coroner's jury is not, in an action on a policy of insurance, admissible on the issue as to the cause of death.

Headnote 1: 37 C. J. pp. 640, 641, 651. Headnote 2: 13 C. J. p. 1256; 37 C. J. p. 633.

Headnote 1: 4 L. R. A. (N. S.) 636; 14 R. C. L. 1235.

*Appeal from Greene District Court.*—E. G. ALBERT, Judge.

DECEMBER 16, 1926.

REHEARING DENIED APRIL 7, 1927.

Action upon life insurance policy. Defense suicide. Directed verdict for defendant. Plaintiff appeals.—*Reversed.*

*T. F. Lynch* and *Howard & Sayers,* for appellant.

*O. O. Roe* and *Wilson & Harris*, for appellee.

MORLING, J.—I.  The policy is dated October 25, 1919.  It provides that if, within two years from date, the insured shall, whether sane or insane, die by his own hand or

1. INSURANCE:
actions on poli-
cies: suicide:
directed ver-
dict.

act, the liability of the association shall be limited to the amount paid by the insured on account of the policy.  The insured died from gunshot wound on August 26, 1921.  The court, holding that the evidence conclusively showed suicide, directed a verdict for defendant.  The principal question argued is whether the plaintiff was entitled to go to the jury.

The law of the case has been so recently and so fully discussed by this court that we need to refer to but two or three settled principles.  *Michalek v. Modern Brotherhood*, 179 Iowa 33; *Tomlinson v. Sovereign Camp of W. of W.*, 160 Iowa 472, and cases referred to; *Green v. New York Life Ins. Co.*, 192 Iowa 32.  It was not for the trial court, nor is it for this court, to determine facts or draw inferences where reasonable minds might come to different conclusions.  The defendant had the burden of proof.  No witness saw the deceased at or near the time or place of the tragedy.  The evidence is entirely circumstantial.  The presumption is against suicide.  To overcome this presumption by circumstantial evidence, the defendant must show the existence of such circumstances and conditions as to leave room for no other reasonable hypothesis than that of suicide.  In other words, the evidence must be such that all reasonable minds must say that the presumption has been overcome, suicide has been proved, and any hypothesis or theory inconsistent with suicide excluded.

The deceased was about 44 years of age at the time of his death, a tenant farmer, married.  A former wife had died, by whom deceased had had seven children, aged from three to eighteen, who were living with him.  About four months before his death, he married a widow, who had five children, three of whom were also living on the farm.  After his remarriage, his second wife was taken to the hospital, and underwent a serious operation.  She returned the Sunday before the Friday on which the deceased died, but was in bed.  There was no indication of any family trouble.  There was evidence to the following effect: The

day before his death, the insured and his wife talked over the matter of moving to a farm which he had in Minnesota, and renting some more land, which he said he intended to do. The talk was that he would take his stock to Minnesota. The evening before his death, the insured asked a repair man to repair a gas engine, and said he would take it into town the next morning. Deceased did send it in. The second day before his death, insured declined to sell horses to a buyer, stating that he had none to spare, and he figured on going to Minnesota. He also talked, during this time, about doing road work with his boys, in addition to farming in Minnesota. He was a good farmer, and apparently normal. One witness noticed, about a week before he died, a change in his demeanor; that he had the appearance of being a little downhearted. He had paid out $5,000 on his Minnesota farm. Before his second marriage, he had expressed fear that he was going to lose his Minnesota land, but he had kept up his payments, though the land was probably not worth as much as there was against it. He was much in debt otherwise.

The foregoing evidence was proper for the consideration of the jury; but the love of life, adherence to it under most discouraging circumstances, love of family, and sense of cowardice in leaving wife and little children to fight life's battles alone, are so strong, and the impossibility of intellectually weighing motives and emotions and of deciding that the life of another is not worth living are so great, that the court, for the purpose of the question before us, can give very little weight to such evidence of motive as this record presents, particularly in this case, when inference of absence of design is as strong as inference of motive for suicide. The question comes down to the one whether the physical facts are such as to conclusively overcome the presumption against suicide and the reasonable possibility of accident.

So far as the evidence shows, the insured was last seen in life when he went into the bedroom and called his daughter, who was sleeping with his wife. At what hour this was, or at what hour his body was found, except that it seems to have been before 9 o'clock in the morning, does not appear. He had frequently engaged in shooting rats that were troubling the chickens, and crows that were thick about the place. To the west and

north of the house was a cornfield, separated from the other land by a fence. There was a grove north of the house, and a small field north of that, and the cornfield was west of the small field. Who discovered the body, and what its then position was, do not appear. A doctor and neighbors were called about 9 o'clock. When they arrived, "the body was found about four rods in the cornfield." One witness says, head to the south, feet to the north, directly north and south. Another says, head a little bit to the southwest. Another says, "The head was a little bit southwest and northeast,—most east and west." Whether it had been moved between the times referred to by these witnesses does not appear. A shotgun was lying six feet north or a little northeast of the feet, muzzle pointing toward the body. At the inquest, there was in the gun one shell that had been exploded. : Witness testified, "I don't remember if the others were exploded." When the doctor opened the clothing, there was no blood on the outside; but when they picked up the body, blood rushed out, indicating internal hemorrhage. The doctor did not testify to the location of the wound, or say what vital organs, if any, were penetrated. So far as shown, the wound was not probed, nor was an autopsy performed. The undertaker testified that there was a hole in the breast, not very much larger than the end of a shotgun; that the back "was smooth and nice, except in feeling over the back you could feel a couple of shot that had not come through the skin. * * * there was no hole through the skin. * * * The shot were apparently in the middle of the back, or below the hole in the front." A neighboring farmer said that he "found a hole right in there, pretty close to the heart, as near as I could judge." The hole was about the size of a quarter or half dollar,—as one says, "pretty round." The evidence is that the cloth around the hole was slightly burned. A witness said that he noticed powder marks on the bib of the overalls. The undertaker expressed the opinion that, "had the gun been real close to the body, there would have been more evidence of powder marks than I found. It was my opinion that the gun was pretty close to the body, but I couldn't say how close." As to the place where the body was found, a witness said that the corn was not very thick there; that "there would be a ridge, and then there would be a kind of a hollow. Every other step, you hit a ridge." There was no

other evidence concerning the condition of the corn or ground, other than that the date was August 26th. No evidence as to whether the ground was slippery. After the body was taken to the house, a witness found, "lying close to where the body was, a cornstalk, with the end cut off with a sharp knife." The gun was a single-barreled pump gun, having a hammer. The plaintiff offered evidence apparently for the purpose of showing that the gun, sometime afterward, while in the same condition, was discharged without any apparent cause; but no definite offer was made, and the questions were too vague to be permissible. No suggestion is made by either party, in evidence or argument, as to the possibility of homicide. The theory of the defendant upon the physical facts is that the deceased either held the gun with the butt higher than the muzzle and discharged it, probably with a piece of cornstalk held in one hand, or that he sat upon the ground, his legs extended, and his body leaning forward, and placed the muzzle over his heart, and pulled the trigger, either with a piece of cornstalk or with the toe of his shoe, and fell backward where he was found, and the recoil of the gun threw it from him to the position where it was found on the ground. Of course, if the evidence is conclusive that one or the other of these alternative methods must have been adopted, the impossibility of determining which, would not prevent the direction of a verdict; but the defendant's hypothesis, as it seems to us, must be based upon what "probably" occurred, and is only a hypothesis,—an inference. There was evidence that from the end of the gun to the trigger was about three feet, and that the gun would weigh seven or eight pounds. There is, of course, no evidence as to how the deceased carried the gun. We know, as matter of general knowledge, that guns are carried in various positions, sometimes over one shoulder, sometimes over another, or over the back, or on or under an arm, sometimes stock forward, sometimes barrel forward. That two shot were lodged under the skin somewhat lower than the wound at entrance may indicate little or nothing. The charge of shot would doubtless spread, on entering the body. Some would probably be deflected by the bony, or even the soft, tissue. There is no evidence as to the course of the main charge of shot and wads. The distance of the gun from the body at the instant of discharge is a matter of argument and conjecture. The direction and position of the

gun at that instant must also be said, on this record, to be purely a matter of conjecture.  There is in the record no evidence whatever as to the age or condition of the gun, particularly whether the trigger was worn; whether a "hair" trigger; how it was adjusted and protected; whether it was in order, or susceptible or not to apparently causeless firing.  The kick of a gun throws the barrel up; and it cannot be said, we think, to be conclusively shown that, if deceased fired the gun with the muzzle pointed toward him, particularly if he was sitting on the ground, the recoil would propel it six feet beyond his feet, even though a doctor testifies that he has had guns "jump farther than that from" his hands.  When the butt strikes the ground in the recoil, the barrel would not necessarily settle in the line in which it was when discharged.  If deceased was holding the gun near or against his body, with the purpose of discharging the load into his body, it might be inferred that he would necessarily have a tight grip upon the barrel at the time of the discharge.  One of the evidences of the firing of a gun by the holder, killing himself, is the strong grip of his hands upon it.  1 Taylor's Medical Jurisprudence (7th Ed.) 550.  We think it cannot be said, upon this record, by the court that the grip which the deceased, if he fired the gun, must have had upon it at the time of discharging it, was necessarily relaxed at or before the moment of recoil.  We do not find in the record evidence that conclusively dispels the possibility that the deceased might not, for instance, have been carrying the gun over his left shoulder, barrel forward, and that, in the course of its being swung over, stock upwardly, either by accident or in the course of stumbling or slipping and recovering, or in some other method which it is the business of the defendant, before it is entitled to a directed verdict, to exclude, the gun, at the instant of its being pointed toward his body, might not have been discharged.  Shooting accidents do most unexplainably occur.  We cannot determine from the record what position the gun would have to be in, nor that it would not be discharged either from the motion of the gun or slight contact with the standing corn.  The cornstalk that was cut apparently was not noticed until after the body had been taken away.  It is altogether a matter of inference as to who cut it, when it was cut, where it actually was in relation to the position of the body, or whether deceased cut it, had it, or used it.

It must be said, we think, that the record as a whole leaves the case in a very vague condition, and that, while reasonable minds may find that the defendant has proved suicide, this record is insufficient to compel all reasonable minds to come to that conclusion. The court erred in not submitting the case to the jury.

II. The verdict of the coroner's jury that the insured "died from the effects of a load of number five shot fired from a 12-gauge shotgun, same entering his body just below nipple and striking the heart, the wound being self-inflicted," and the coroner's inquisition, of which this was a part, were received in evidence over appellant's objection. In *Metzradt v. Modern Brotherhood*, 112 Iowa 522, such a verdict offered by defendant was received. The plaintiff recovered judgment. On appeal by defendant, the court said that plaintiff's counsel did not question the admissibility of the verdict, and added:

2. INSURANCE: actions on policies: evidence: verdict of coroner's jury.

"* * * we think it is competent evidence on such an issue as this. As to its effect, the defendant only claims that it is prima-facie evidence of death by suicide. * * * Giving to this verdict the effect claimed for it, and considering it in the light of the circumstances attending the death of the assured, we still think it is fully overcome by other evidence."

The judgment was affirmed. It will be seen, therefore, that the question of admissibility over appellant's objection was not in the case.

In *Mittelstadt v. Modern Woodmen*, 143 Iowa 186, no objection to the admissibility of the coroner's verdict was made, and it was not contended on appeal that it was inadmissible. The opinion states:

"We have no occasion, in view of this record, to consider the admissibility of the testimony."

In *Dufree v. Wabash R. Co.*, 155 Iowa 544, a personal injury case, it is said:

"We have held that a coroner's verdict is competent evidence for some purposes" (citing the *Metzradt* case).

The offer there included papers not before the court. The exclusion of the verdict was held not prejudicial.

In *Tomlinson v. Sovereign Camp of W. of W.*, 160 Iowa 472, there was a judgment for plaintiff and appeal by defendant. The court there said:

"The objection made to the coroner's verdict must have been interposed by plaintiff's counsel, although the record is apparently to the contrary. This court has heretofore held such testimony admissible. *Metzradt v. Brotherhood,* 112 Iowa 522. And, whatever may be thought of this rule by the court as now constituted, the defendant suffered no prejudice from the admission thereof, and the objection which was interposed came from plaintiff's counsel, and not from defendant."

In *Michalek v. Modern Brotherhood,* 179 Iowa 33, it is said:

"This court has sustained the admissibility in such cases of the verdict of a coroner's jury,—an extreme holding, to the propriety of which the writer does not assent; but it has never yet taken the step beyond that limit which is required to give admissibility in evidence of such officer's opinion, or of his report of such opinion to an administrative board or commission having no interest therein or official duty in connection with the death of the deceased except as an item in the compilation of a table of vital statistics. In this case there was no inquest, no coroner's jury, and no pretense of a verdict of such a body."

These cases are the only cases which have come to our attention where the question has been raised in this court. In none of them was the question of admissibility over appellant's objection passed upon. The coroner is required to hold an inquest upon the dead bodies of such persons only as are supposed to have died by unlawful means, and in such cases as are required by law. Code of 1897, Section 515 (Code of 1924, Section 5200). The coroner's jury is required to return "when, how, by what person, means, weapon, or accident he [deceased] came to his death, and whether feloniously." Code of 1897, Section 521 (Code of 1924, Section 5208). The proceedings have no reference to and are not intended for the ascertainment of civil rights or liabilities. The parties interested in such rights or liabilities are not before the coroner's jury, at least by virtue of their interests. Such interests are not before the coroner's jury for determination, nor are the parties to them, as such, before the court, or heard. The finding in most cases must be, as to such parties, merely an opinion and hearsay. Certainly it is not, as between them, a judicial determination. The coroner has not the means, nor has he, as to civil rights involved, the knowledge, essential to a judicial inquiry. The proceedings are not con-

ducted for the purpose of determining civil rights, nor in a manner adapted to the ascertainment of the facts determining such rights. The proceedings are informally, and often carelessly, conducted. In this case the verdict could have been no other than a mere ex-parte conclusion by the men who happened to constitute the coroner's jury, and founded on hearsay, so far as the parties to this controversy are concerned. The great weight of authority is opposed to the admissibility of the proceedings on the inquest and verdict, as evidence of the cause of death in a later civil proceeding. We are of the opinion that the reception of the proceedings in the inquest and the verdict was error. *Groeschner v. Gund Brewing Co.*, 173 Wis. 366 (181 N. W. 212) ; *Wasey v. Travelers' Ins. Co.*, 126 Mich. 119 (85 N. W. 459) ; *Cox v. Royal Tribe*, 42 Ore. 365 (71 Pac. 73, 60 L. R. A. 620, 95 Am. St. 752) ; *Goldschmidt v. Mutual Life Ins. Co.*, 102 N. Y. 486 (7 N. E. 408) ; *Hollister v. Cordero*, 76 Cal. 649 (18 Pac. 855) ; 37 Corpus Juris 633; 13 Corpus Juris 1256, and cases collated in these authorities.

The expressions in our cases referred to, to the effect that the inquest or verdict is admissible, do not correctly state the law, and are overruled.

III. Other exceptions shown by the record not governed by the foregoing discussion were either not so presented below or are not so presented here as to be entitled to consideration.

The judgment is—*Reversed.*

EVANS, STEVENS, FAVILLE, and VERMILION, JJ., concur.

DE GRAFF, C. J., dissents.

DE GRAFF, C. J. (dissenting).—I respectfully dissent from the conclusion reached by the majority that a jury question is presented in the instant case. The ruling of the trial court in sustaining the motion of the defendant for a directed verdict has no relation to the ruling of the trial court on the admissibility of the verdict of the coroner's jury respecting the cause of death of plaintiff's decedent.

I recognize that the numerical weight of judicial authority is opposed to the admissibility of the proceedings on an inquest and verdict therein in a subsequent civil proceeding, and I therefore concur in the reasoning and the principle stated in

Division II of the majority opinion. This matter is not of the essence of the primary question involved on this appeal.

The policy in suit was issued October 25, 1919. The insured died August 26, 1921. The policy contains this clause:

"If within two years from the date of issue of this policy, the insured shall, whether sane or insane, die by his own hand or act, the liability of the association shall be limited to the amount paid to it by the insured on account of said policy."

Did the insured voluntarily fire the shot that caused his death, or was the discharge accidental? It is certain that D. M. Barrett did not die from a natural cause, and it is not claimed that his death resulted from a felonious homicide. If there is but one conclusion that can fairly and reasonably be drawn from a consideration of all the evidence in the case,—namely, that Barrett's death resulted from a gunshot wound intentionally inflicted by himself,—the ruling of the trial court in directing a verdict for the defendant should be sustained. In my judgment, there is but one conclusion that can be predicated on the physical facts, and there are no other controlling facts.

The rule is quite universal that, when death is shown, it is presumed to have resulted from an accidental cause, and not from suicide. In commenting on this proposition, it is said in *Tomlinson v. Sovereign Camp W. O. W.,* 160 Iowa 472:

"This, of course, is not a legal presumption, but rather a presumption of fact, or inference, which is to be drawn from the fact that men do not, as a rule, commit suicide; * * * It is a rebuttable presumption, and, in cases like the present, casts the burden upon the defendant of showing that the wound which caused the death was self-inflicted or suicidal in character."

In other words, the defendant must overcome this presumption of fact by affirmative evidence and the permissible inferences to be drawn therefrom.

The question then is: Do the facts disclosed by the evidence in the case at bar so negative the presumption that death was accidental as to leave no other reasonable hypothesis than that of suicide? I make answer in the affirmative. The physical facts at the time the body was found, offer no reasonable explanation except that the death of the insured resulted from an act of self-destruction.

The defendant lived on a rented farm about four miles east

and a mile and a half south of Paton, Iowa. His body was found some distance from the house, in a cornfield on the farm, about 4 rods from the fence, shortly before 9 o'clock on the morning of August 26, 1921. He was lying prostrate on his back, with his feet to the north and his head to the south. The shotgun, with one shell exploded, was lying about 5 or 6 feet and a little to the northeast of his feet, with the muzzle of the gun pointing toward the body. The recoil of the gun explains its position. The hole in the body caused by the shot was round, and about the size of a 25-cent piece. His clothing, where the shot entered his body, was powder-marked. The shot entered the left breast directly over the heart, coursing downward from horizontal. The location of the wound and the course of the shot preclude the inference that the gun was fired by dragging it.

The gun that was used was a 12-gauge pump-model shotgun, weighing about 7 or 8 pounds. The barrel of the gun was about 30 inches long.

Barrett was not a stranger to the use of a gun, and the evidence negatives the inference that the gun was accidentally fired by his tripping or stumbling as he walked along. There is nothing shown in the field that would cause the accidental discharge of the gun. On the contrary, it is shown that a cornstalk, with the end cut off by a sharp knife, was found ''lying close to where the body was.'' The fair inference is that the cornstalk was the means used by Barrett to release the trigger. The conclusion is inescapable that the butt of the gun at the time the shot was fired was slightly higher than the muzzle, and, when fired, must have been placed or held directly in front of the body and in close proximity thereto.

The medical testimony discloses that Barrett must have fallen back immediately, and died almost instantly, upon receiving the shot, and that his body did not move thereafter. Doctor Waddell, who was immediately called, and who examined the body before it was moved, testified:

''When I opened the clothing on the body, I noticed that there wasn't even a drop of blood on the outside; and when we picked the body up, and went to move it, the blood rushed out of the wound and over my clothes, and it bled freely. It indicated that there had been an internal hemorrhage.''

The condition of the body and circumstances attending its

discovery negative the theory of accident. The evidence, as a whole, is consistent with the conclusion of suicide, and it may not be said that the facts are equally consistent with some other conclusion.

The administrator, prior to the commencement of this action, upon filing his application in the probate court for authority to make settlement with the defendant-company, pursuant to the stipulation in the policy for the refunding of the premiums paid by decedent, alleged under oath that David M. Barrett "came to his death by his own hand." We do not stress this recital, and it was subject to explanation. Nevertheless, it discloses the attitude and conclusion of affiant in the matter at that time.

Some attention is given in argument to the question of motive. It is but natural in a case of this character that this inquiry should arise. However, the physical facts and the attending circumstances constitute a complete answer to the primary question involved on this appeal. The psychology of the case is incidental, and in reaching a decision we are not compelled to adopt the philosophy of Hamlet, and wonder why the insured did "his quietus make," rather than "sweat and grunt under a weary life."

To submit a case of this character to a jury is simply to permit the jurors to wander into the fields of speculation and conjecture. As said in *De Weese v. Sovereign Camp W. O. W.,* 110 Kan. 434 (204 Pac. 523):

"Jurors are not to be permitted to shut their eyes to what everybody else sees and understands, and wander off into fields of imagination and suspicion, in order to reach verdicts. Courts are more and more realizing and declaring that they must not permit themselves to be more ignorant than anybody else, or fail to see what is plain to everyone and everybody except a court."

I reach the conclusion that the evidence sustains the contention of appellee, and that the ruling of the trial court should be affirmed.