C. O. WILKINSON, Administrator, Appellee, v. NATIONAL LIFE ASSOCIATION, Appellant.

No. 39293.

MAY 7, 1929.

*Ole O. Roe* and *Wilson & Harris,* for appellant.

*T. F. Lynch* and *Howard & Sayers,* for appellee.

WAGNER, J.—This is the second appeal of this case to this court. For opinion on former appeal, see *Wilkinson v. National Life Assn.,* 203 Iowa 960. Generally speaking, the facts are stated in the opinion rendered on the former appeal, to which, for the sake of brevity, reference is hereby made. However, as we proceed, we will mention some additional testimony, which was not before the court on the former appeal, and also some of the testimony which is identical with that on the former trial.

At the close of the evidence, the defendant, by motion, asked for a directed verdict, which motion was overruled. This motion was substantially identical with the one made at the former trial. The defendant also filed a motion for a new trial, again raising the same proposition, and urging therein that the verdict is con-

trary to and not sustained by the evidence. The real question in the case is as to whether or not the circumstantial evidence conclusively eliminates every theory of death other than by suicide. If so, then the defendant's motion for a directed verdict, and also its motion for a new trial, should have been sustained. If not, then it became a question of fact, for the determination of the jury.

The law is well stated in the opinion on the former appeal, as follows:

"It was not for the trial court, nor is it for this court, to determine facts or draw inferences, where reasonable minds might come to different conclusions. The defendant had the burden of proof. No witness saw the deceased at or near the time or place of the tragedy. The evidence is entirely circumstantial. The presumption is against suicide. To overcome this presumption by circumstantial evidence, the defendant must show the existence of such circumstances and conditions as to leave room for no other reasonable hypothesis than that of suicide. In other words, the evidence must be such that all reasonable minds must say that the presumption has been overcome, suicide has been proved, and any hypothesis or theory inconsistent with suicide excluded." *Wilkinson v. National Life Association,* supra.

In *Michalek v. Modern Brotherhood of Am.,* 179 Iowa 33, we made the following pronouncement:

"That the defense relied upon is an affirmative one, and the burden of establishing it is upon the appellee [the defendant], is so well settled that we will not take the time necessary for the citation of authorities. The burden thus assumed is something more than ordinarily rests upon a party who undertakes to establish an asserted fact over the bare denial of his adversary. In a case of the latter class, there is ordinarily no presumption for or against either party. Here, however, the defendant is met by a presumption against suicide or suicidal intent. That such is the general rule, all courts admit; but as to its effect and operation, there is some dissonance of opinion. Some have treated the presumption as of rather slight value, and easily overcome (*Agen v. Metropolitan Life Ins. Co.,* 105 Wis. 217); but by far

the greater number and the better reasoned cases unite in holding that the party charging suicide, where circumstantial evidence is relied upon to support the claim, can overcome the presumption against self-slaughter only by proof of facts which exclude every reasonable hypothesis of natural or accidental death. * * * It must be remembered that, in order for plaintiff to recover under the issues and the admitted facts, she was not required to set up or prove the truth of any particular theory of the exact manner of Michalek's death. To defeat her recovery, the defense was required to prove its theory of suicide, and this it cannot be said to have done, no matter how strong or persuasive the showing, unless it goes to the extent of eliminating every theory of death otherwise than by suicide.''

In support of the foregoing propositions, see, also, *Green v. New York Life Ins. Co.*, 192 Iowa 32; *Wood v. Sovereign Camp of W. O. W.*, 166 Iowa 391; *Tomlinson v. Sovereign Camp of W. O. W.*, 160 Iowa 472.

The deceased met his death on the morning of August 26, 1921. About 4 o'clock in the afternoon of the preceding day, he called a blacksmith, asking him to come to his home and repair a gasoline engine. The blacksmith suggested that he bring it in, the next forenoon, and the insured said that he would send it in the following day, which he did. About 5 o'clock on the morning of his death, he arose, and called his daughter,—who was sleeping with his wife,—and one of his sons,—who was sleeping in another bedroom,—and told the latter to ''hurry around, to take the gasoline engine to town to Ladd's blacksmith shop in Paton.'' A short distance north of the house and lots was a grove, a harboring place for crows. These birds had been preying upon the small chickens, which roamed in close proximity. He had, at various times, engaged in shooting crows in the grove with this same gun. Mrs. Barrett, the wife of the insured, had been in the hospital at Des Moines for about a month, returning home on the Sunday preceding her husband's death, the following Friday. She was not at this time able to be up much of the time, and did not arise from bed on the fatal morning. About 5:30 or 6 o'clock A. M., she heard two shots. Late in the forenoon, the body was found in the cornfield, a few rows of corn west of the fence, between the cornfield and the grove hereinbe-

fore mentioned, by one of his sons, who was absent,—probably in a foreign state,—at the time of the trial. He reported the fact to his older brother, Francis Barrett, and the two went to the place where the body lay, and assistance was soon thereafter called. The body and gun were lying in the position as stated in the former opinion. It is shown by the testimony on the second trial that, previous to the day in question, hogs had been allowed in the field of corn where the body lay, and that, in addition to the condition of the ground as shown in the former opinion, the ground in spots was rough, caused by the rooting of the hogs. There is additional testimony to the effect that there had been heavy wind that had blown down some of the corn; that some of it was lying pretty nearly flat, and some of it leaned, and some of it was standing straight. There is also additional testimony in this trial to the effect that the gun was out of order; that, a short time previous to Barrett's death, while the gun was in the same condition that it was on this particular morning, one of the boys took the gun from the house, and, as he was stepping off the porch, without any apparent reason it discharged; that, a few weeks later, the gun, while in the same condition, was being carried by a member of the family, and was again discharged. It is apparent that the deceased died as the result of a shot from the shotgun in question, the charge entering the body in the region of the heart. As stated in the former opinion, the wound was not probed, nor was an autopsy held.

It is the theory of the defendant, in argument, that the deceased "sat on the ground, his legs extended, and his body leaning forward from the hips, and while in this position, placed the muzzle of the gun over his heart, pushed the trigger with a piece of cornstalk, or the toe of his shoe, and fell backward from the force of the discharge and relaxation of body muscles into the position flat on his back, as he was found, his hat down forward over his eyes, and the gun flung back by the 'kick' or recoil, to the position where it was found on the ground, the muzzle pointing toward his body." Much is said in the arguments, pro and con, as to whether or not a cornstalk was lying near the place where the body was found. Some testimony with reference to a cornstalk was received in evidence at the time of the first trial, but finally excluded by the court. At the time of the second trial, Dr. Waddell, an examiner for the defendant company, testi-

fied that, on the former trial, he stated that he was unable to recollect whether he saw a cut cornstalk lying by the body; that since that time he has refreshed his recollection, and now says that he saw a cornstalk lying, as nearly as he can remember, about two feet to one side of the body. The first trial was in April, 1923; the second trial in September, 1927. The doctor was confronted with his testimony at the former trial, wherein the following questions were propounded and answers given:

"Q. Did you see, at or about that time and in that proximity, a cornstalk, the end of which had been cut with an edged instrument or a knife? A. I do not remember whether I did or not. Q. Did you see a cornstalk exhibited that day? A. Yes, sir. The cornstalk was brought up to the house later by someone, I don't know who, and they showed the cornstalk there, is all I know."

It is hardly probable that the memory of a member of the medical profession would be better in 1927 than it was in 1923. Another witness, who assisted in carrying the body from the cornfield, testified at this trial:

"I saw a piece of cornstalk lying there, the end cut as with a sharp instrument, like a knife. It lay pretty close to the body. I wouldn't say just how far away. I think it was on the right side of the body. I saw that cornstalk later. I brought it up to the house, me and one of the Barrett boys, after the body was taken up."

This witness also testified that he has had his memory refreshed about the cornstalk. He was likewise confronted with conflicting testimony with reference to the cornstalk, given by him at the time of the first trial. One Mayfield, who was not a witness at the time of the first trial, testified that he helped carry the body from the cornfield; that he saw a piece of cornstalk as near as three or four feet from the body; that it was picked up and shown to him; that the cornstalk was probably three feet long; that it was on the left side of the body (the deceased was shown to be right-handed), was about three feet from the feet of the deceased, and still farther north of a line where the gun was. There is also impeaching testimony, as against this witness. The foregoing are the only witnesses testifying for the appellant rela-

tive to having seen a cornstalk in the immediate vicinity where the body lay; and, they having made contradictory statements, sworn or otherwise, the credibility of their testimony was for the jury. The son of the deceased, who was at the body before any of the witnesses for the defendant appeared, testified that he saw no cornstalk. With reference to the cornstalk, we said in the former opinion:

"It is altogether a matter of inference as to who cut it, when it was cut, where it actually was in relation to the position of the body, or whether deceased cut it, had it, or used it."

It is no more certain under the record at this trial, or whether there was a cornstalk lying near the body, when found. There is testimony by the appellee to the effect that corn for feeding purposes had been cut at the edge of the field. The firearm in question was a 12-gauge Winchester Pump Shotgun. There were no loaded shells found in the gun at the time in question. The remainder of the relevant testimony is substantially the same, or the equivalent of what is mentioned in the former opinion.

In our former opinion, we held that the testimony was such as to present a question for the determination of the jury. Does the additional testimony herein referred to, change that conclusion? We answer in the negative. It is not for us to determine how the deceased met his death. The presumption is that the death was accidental. The burden of proof is upon the defendant to prove its theory of suicide, and it cannot be said to have done this, no matter how strong or persuasive the showing, unless it goes to the extent of eliminating every theory of death otherwise than by suicide. This it has not done. The evidence is not such that all reasonable minds must say that the presumption of accident and against suicide has been overcome. Under the record, the death of the decedent was either accidental or suicidal. The burden was upon the defendant to prove the latter and overcome the presumption of the former. This cannot be done by showing a probability only of suicide. The circumstantial evidence is not sufficient to exclude every reasonable hypothesis other than that decedent's death was suicidal. The evidence does not tend to establish appellant's theory of suicide more strongly than on the

former appeal. If anything, the evidence as a whole is more favorable to the appellee.

We find no error in the rulings of the trial court, and the judgment rendered is hereby affirmed.—*Affirmed.*

EVANS, STEVENS, MORLING, KINDIG, and GRIMM, JJ., concur.

DE GRAFF, J., dissents.

ALBERT, C. J., takes no part.

DE GRAFF, J. (dissenting).—I have no reason to change my viewpoint as expressed in the dissent in the former opinion adopted by this court. 203 Iowa 960, l. c. 968. The plaintiff simply stands on a mere inference or presumption of fact, rebuttable in character. The physical facts fully explain the cause of death of David M. Barrett, and rebut the theory of accident. These facts leave no other reasonable hypothesis than that Barrett died from the effects of a gunshot wound intentionally inflicted by himself. To my mind, it is physically impossible for any person to carry the gun in question in any position, and through accidental discharge cause a wound to be inflicted as it was inflicted here. On the contrary, the physical facts are all present to explain the manner of the discharge of the shotgun in question. It is a case of suicide, and I am not in favor of permitting jurors to close their eyes, exercise their imagination, and wander in a field of suspicion and speculation, in order to reach a verdict against an insurance company, or any company.

The trial court in the first instance correctly ruled this case, and directed a verdict against the plaintiff.