**NOBLE v. UNITED STATES.**

No. 11073.

Circuit Court of Appeals, Eighth Circuit.

Aug. 9, 1938.

Frederick H. Wagener, of Lincoln, Neb., and Carl T. Self, of Omaha, Neb., for appellant.

Kenneth E. Spencer, Atty., Department of Justice, of Washington, D. C. (Julius C. Martin, Director, Bureau of War Risk Litigation, of Washington, D. C., Edward G. Dunn, U. S. Atty., of Mason City, Iowa, Wilbur C. Pickett, Sp. Asst. to Atty. Gen., and Young M. Smith, Atty., Department of Justice, of Washington, D. C., on the brief), for the United States.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

GARDNER, Circuit Judge.

This is a war risk insurance case. The pleadings, which are for the most part in conventional form, disclose that appellant, who was plaintiff below, claimed that on or about April 26, 1918, while in military service, he was struck on the head by a falling beam and that due to that injury he became totally and permanently disabled. By an amended petition, it was alleged that plaintiff received total permanent disability and injuries while the insurance policy was

in effect, "due to and by reason of his service in the United States Army and on account of the heavy strain and exposure and contracted disease while in the service and among other injuries the plaintiff was struck on the head by a falling beam." Plaintiff's testimony was to the effect that on the 26th of April, 1918, one end of a steel beam struck him on the head. Referring to this incident, he testified:

"I laid there about fifteen minutes and one of the boys from the truck came and shortly an ambulance came and picked us up and took us to the first aid station where we laid on a cot without medicine or examinations until the next morning. I felt numb with no feeling. It was impossible to get up. Could move my arms and feet very, very small. I had no examination or treatment there and I got up and started to go with the rest of them and we got to a large gully, valley or something and that was the last I remember, I became unconscious. The next I remember after about three days. I was on a depot platform at Chateauroux and I felt just numb. I was taken to a base hospital at Chateauroux, France, and 'I was there about two weeks and did not receive any treatment. I was then transferred on a stretcher by truck' train to Mon Pont, France. All this time I had been speechless from the time I went unconscious."

He remained there until May 18. Then, he said, he was more normal, but he would stagger as if he were drunk. Plaintiff testified quite fully with reference to his subsequent condition and his hospital experiences.

At the close of all the testimony, the Government moved for a directed verdict, which was denied, and thereupon the plaintiff moved for a directed verdict, which was likewise denied. The case was submitted to the jury on instructions to which plaintiff took no exceptions. The jury returned a verdict in favor of defendant, upon which judgment of dismissal was entered, and this appeal followed.

■ The sole question presented is whether or not the court erred in overruling plaintiff's motion for a directed verdict, and in submitting the case to the jury. In considering this question it will be necessary to refer to the testimony, not for the purpose of weighing it, but for the purpose of determining whether there was substantial evidence to sustain the verdict in favor of the defendant. In considering

the evidence for that purpose, we must assume that the jury accepted as true the testimony in favor of defendant, and we must accept it as true, and we must allow the defendant such reasonable, favorable inferences as may be drawn therefrom. If the evidence so considered was such that reasonable men might reach different conclusions, then the case was one for the jury. Illinois Power & Light Corp. v. Hurley, 8 Cir., 49 F.2d 681; Chicago, M., St. P. & P. Ry. Co. v. Linehan, 8 Cir., 66 F.2d 373; Chicago, B. & Q. R. Co. v. Kelley, 8 Cir., 74 F.2d 80; Kladivo v. Melberg, 210 Iowa 306, 227 N.W. 833; Wilkinson v. National Life Ass'n, 203 Iowa 960, 211 N. W. 238.

■ The burden of proof was upon the plaintiff to establish that during the life of his policy he became permanently totally disabled.

■ The argument of appellant is in effect that the testimony was such as to have sustained a verdict in his favor. In overruling defendant's motion for a directed verdict, the lower court so held, but it does not follow that the evidence was of such a character as to compel such a verdict. The jury found on the evidence submitted that the plaintiff had not become totally and permanently disabled during the life of his insurance contract.

■ First, we note in passing, that while plaintiff claims that he became permanently and totally disabled in April, 1918, this action was not brought until September, 1931, more than thirteen years after the accrual of his claim. This delay was significant. As said by the Supreme Court in Lumbra v. United States, 290 U.S. 551, 54 S.Ct. 272, 276, 78 L.Ed. 492, "And in the absence of clear and satisfactory evidence explaining, excusing, or justifying it, petitioner's long delay before bringing suit is to be taken as strong evidence that he was not totally and permanently disabled before the policy lapsed."

On this same question, the Supreme Court, in United States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617, among other things, said (page 276): "The fact that, notwithstanding his need of money for the support of his family and himself, he failed for nearly nine years to sue for the insurance money now claimed strongly suggests that he had not suffered total permanent disability covered by the policy."

Plaintiff's only explanation for his long delay in making claim for this insurance is that he did not realize "that it was a policy that I could draw on, which I am trying to do, at that time, until I was informed by the Legion of Nebraska. I was informed by them I could. I was so advised about in 1930."

Plaintiff is not illiterate. The record indicates that he is a business man of intelligence. We think this so-called explanation is far from being "clear and satisfactory evidence explaining, excusing, or justifying" this delay. The Supreme Court says that such delay is "strong evidence that he was not totally and permanently disabled." ·

█ It may next be observed that when discharged, he declared in writing that he was not suffering from the effects of any wound, injury or disease, and that he did not have any disability or impairment of health, whether or not incurred in military service. This was a declaration against interest, which was evidence tending to show that at that time at least plaintiff was not totally disabled by reason of the injury which he claims to have received while in the service, or otherwise.

Having in mind that plaintiff attributes his alleged permanent total disability to an injury received by him while in the service on April 26, 1918, it is to be observed that the hospital records do not lend any support to this contention. These records indicate that plaintiff was suffering from acute laryngitis and pleurisy, but there is no record of any injury to the head. On his certificate of discharge, over plaintiff's signature, appears the following: "Wounds received in service: None. Physical condition when discharged: Good."

At the time of plaintiff's discharge, there was entered of record a certificate of the examining surgeon, to the effect that this plaintiff was given a careful examination and it was found that, "He is physically and mentally sound, with the following exceptions: Dental deficiency full upper denture." There was introduced in evidence a page from the report of the Board of Review, as follows: "From a careful consideration of the case and critical examination of this soldier, we find that he is physically and mentally sound." Underneath this entry, is the following: "Dental deficiency full upper denture. Not aggravated." This certificate is signed by two physicians.

█ All of this evidence which was sent to the jury, and which, if believed by them, as it evidently was, tended to show that plaintiff had not become totally and permanently disabled during the life of his policy.

A cerebellar operation was performed on plaintiff in 1928 and a cyst was found in the right lobe of his cerebellum. Dr. Lincoln, called by the Government, testified that such a tumor could not be caused by trauma. The tumor had been described by plaintiff's witnesses as a benign tumor. Speaking of such a tumor, Dr. Lincoln testified: "A benign tumor is a slow growing tumor. Tumors are in a broad way classified into benign and malignant, and a benign tumor is one that does not cause much trouble, or very little trouble, does not cause result of death."

One of plaintiff's doctors testified that plaintiff's tumor was caused by trauma, and that its pressure, unless relieved by operation, could result in death. But this simply gave rise to a conflict in testimony, and, again, we must assume that the jury believed the testimony of Dr. Lincoln. Plaintiff's medical testimony was to the effect that he was suffering from a cerebellar tumor, but while plaintiff's medical witness testified that he advised plaintiff to avoid strenuous or heavy work, yet he expressed the view that normal exercise and work would be beneficial. Dr. Grand, among other things, said: "A man could work on a tractor and not overexert himself. I believe he might do work on a tractor that would be hurtful to him, and he might do work also that wouldn't hurt him. * * * Mr. Noble might in 1924 have been around his machine shop periodically, not every day, not all day, but during the week. He might work in the capacity of supervisor without materially raising the blood pressure, and he might do a small amount of handiwork around without materially raising his blood pressure. We must consider just the work that tends to raise blood pressure, increases the pulse rate, in this type of case. He might do that without having such an effect."

We turn now to the testimony with reference to plaintiff's work record. The jury might have found from the evidence that upon his discharge he returned to his job at the Holmberg Machine Shop, working ten hours a day, six days a week. He quit, not because he was unable to do

the work, but because of an argument with his employer, and he immediately went to work for Earl S. Shaw, and later married Shaw's sister. The three of them operated a 160 acre farm. Plaintiff drove a team, plowed, worked with a threshing machine gang, drove a tractor, repaired implements and machinery and helped feed the stock. This continued until February, 1924, when he and his wife moved to the town of Sac City, Iowa. From that time he has owned and operated a garage and repair shop for automobiles, trucks, tractors, and farm machinery. In the supervision and management of this business, he has had from one to five mechanics employed. The business grew, so that in 1927 he moved into a new building of his own. He has invented and patented a harrow device, which he manufactures and which he has manufactured for him by another concern. The demand for this product now exceeds its production. Plaintiff is also sales agent for J. I. Case & Company, makers of farm machinery, and does a substantial business with them. He traveled for this concern at different periods in 1929 and 1930. He threshes grain on contract, being the owner of three threshing outfits, which he sends out with operators.

In the face of the record in this case, it is idle to contend that plaintiff was entitled to a directed verdict. The judgment appealed from is therefore affirmed.