MARIE REDDICK, Appellant, v. THE GRAND UNION TEA COMPANY, Appellee.

No. 45460.

MARCH 18, 1941.

REHEARING DENIED JUNE 20, 1941.

110

Carl F. Jordan, for appellant.

Paul W. Steward, for appellee.

GARFIELD, J.—The issues before the commissioner were whether deceased died from injury arising out of and in the course of his employment, or from either suicide or intoxication. The evidence is entirely circumstantial. It will be necessary for us to state it in some detail.

Appellant's deceased husband, V. P. Reddick, had been in appellee's employ approximately four years. He had recently been made assistant manager, though during the period immediately preceding his death he had been acting as a route salesman in the territory surrounding Decorah. Appellee rented a private garage from one Porter for the purpose of storing its truck from which deceased made deliveries of groceries and other merchandise along his routes. Surplus merchandise not carried in the truck was also delivered to and stored in this garage. The garage was 14½ feet by 19½ feet and 11 feet, 2 inches high. The double doors into the garage were approximately 8 feet high, with a hook and bolt on the inside at the top and also at the bottom. There was also a side door to the garage 21 inches wide and not quite so high as the double door, with a padlock on the outside. The garage was neither heated nor lighted.

About noon on Monday, December 5, 1938, Reddick's lifeless body was found in the garage. The double garage doors were closed and, according to some of the witnesses, were hooked and bolted at the top. The sheriff testified that when he arrived these doors were not fastened at the top, but only at the bottom. The coroner, also an early arrival, testified that the doors were locked at the top but not at the bottom. It is undisputed that the smaller single garage door was wide open. The employer's truck was in the garage with the ignition key turned on but the engine

was not running. The throttle was opened a short distance. The left front door of the truck, at the driver's side, was open. The right front door and the rear truck door were closed. The battery of the truck was dead. The gasoline tank was from one-fourth to one-half full. The body was lying to the rear of the truck with the face approximately 18 to 20 inches from the exhaust outlet. It was lying on the right side with the shoulders up against the double door. One hand was between the thighs and the other across the chest. "The body was in a sort of doubled up position." The testimony shows that the front of the truck was so close to the wall there was not room for a person to go in front of the truck.

There is considerable testimony with regard to papers or paper bags lying on the garage floor. One paper or paper bag was lying under the shoulders or head and another approximately under the feet. The coroner testified:

"It seemed like there was paper sacks, * * * I suppose he used those to deliver stuff in, was lying on the floor; his feet was on one of them.

"Q. Did you see three or four of these sacks scattered around? A. Yes, well, like there was a bunch of them like that."

Claimant testified:

"There was some pieces of waste material, the door was fastened on to a wastepaper basket full of paper. The door was swung open and caught on one bunch."

No tire marks were observed on the paper under the head or shoulders.

There is substantial testimony to the effect that when the body was discovered, decedent's coat was caught on the door. Claimant testified:

"His coat was caught on the door and was crumpled up across his back and around his neck sort of. * * * His hat was just tipped off his head. His coat was on and * * * all drawed up around his neck like he partly slipped out of his coat. Like he had slid and his coat was kind of caught because when I went to get hold of him he was sort of caught on the door."

The sheriff testified that when he arrived no part of the clothing was caught on the door. An attempt had been made to lift the body before the sheriff arrived. No witness testified to any bruises or abrasions upon the body. It is conceded that death was caused by carbon monoxide poisoning. Doctors who examined the body at approximately 4:30 Monday afternoon gave it as their opinion that death had occurred at least 12 to 18 hours earlier.

Decedent was the only person to whom keys to the garage were entrusted. Merchandise of the company sent to Decorah was delivered at the garage. It was decedent's duty to unpack these goods in the garage. It was also his business to put the truck in the garage when not in use. When the merchandise was unpacked it was Reddick's duty to place so much of it as was necessary in the truck for delivery to customers. The testimony shows that Reddick was behind with his route at least one day or perhaps somewhat longer. This was at least partly due to the Thanksgiving holiday.

There is undisputed testimony that decedent would ordinarily work in the garage on Saturday night and sometimes on Sunday. This work consisted partly of unpacking merchandise and placing it in the truck. The district manager, as a witness for appellee, testified:

"Then there would be the unpacking and checking of the shipments of merchandise that had come in from Davenport. Well, there would be some reports to make out. There is a final report of the last three days sales and the complete order sheet for the entire week would have to be made up sometime between Saturday and Monday morning. The merchandise that is sent in to be unpacked, was to be delivered to the Porter garage. * * * He would unpack it there in the garage."

It was Reddick's duty to keep an inventory of the goods and to receipt for the merchandise delivered at the garage.

Decedent had spent the night of Friday, December 2d, in the hotel at Lansing, leaving there about 11 Saturday morning. His route book showed that only five customers on the route supposed to have been covered on Friday were called upon, and that no customers were thereafter solicited by deceased.

Deceased arrived at the house where he roomed in Decorah at approximately 3:30 Saturday afternoon. He left his room and returned about 5. There is evidence that he had been drinking at this time; that he said he had been drinking and lost sleep the night before. He was next seen at about the dinner hour in the taproom of the Winneshiek hotel where he stayed intermittently until 10:30 or 11. In the taproom he drank beer. About 9 o'clock Saturday evening he appeared on the street with a pint bottle of whisky about half full which he was waving in the air. There is testimony that he was loud and boisterous at least part of the time he was in the taproom. He took part in a game of bingo and sat in a booth with two young ladies, one of whom was a schoolteacher living about a mile east of Decorah, whom he had previously met at a dance. He took a telegram out of his pocket, telling the young ladies he was to meet someone on the following Monday in Decorah but that he would not be there to meet him. About 11, Reddick appeared in the Dotseth bakery where he took another drink.

About midnight the employer's truck was gotten from in front of the house where Reddick roomed and driven to the schoolteacher's home. The teacher drove the truck to her home but Reddick drove back to town. Upon separating from the teacher at about 12:30, Reddick handed her a nickel, asking her to keep it until she saw him again and to keep it forever if she never saw him again. There is no direct evidence that deceased drank after returning to Decorah. Reddick was next seen about 1 o'clock Sunday morning in the Davis cafe where he was joined by one Ernest and two Langlas sisters. These four people left the cafe, riding in appellee's truck, and proceeded to the home of Dotseth, the baker. Another couple was also at the Dotseth home. Dotseth did not arrive at his home until about 4:30. At that time Reddick was asleep in a chair. He awoke, said, "Well, I am glad I met you folks," and left. At that time Dotseth testified that Reddick's condition was just like his would be after he had a little snooze, "half way groggy." He left the Dotseth home about 4:30 or 5 Sunday morning, presumably in appellee's truck. That is the last he was seen alive.

The foregoing, although omitting many details, sufficiently

114

indicates the character of the testimony. Some further facts are hereinafter mentioned.

■ I. The material part of the findings and judgment of the trial court reads as follows:

"The Court finds and determines: That the evidence points strongly to suicide as the cause of the death of Vivian Pearl Reddick, and the Court finds that he met his death by reason of suicide. Through his continuous debauchery just prior to his death, Mr. Reddick submitted himself to a hazard which was the immediate cause of his decease. The Court further finds and determines that the death did not arise out of and in the course of the employment of Mr. Reddick by the Grand Union Tea Company. The decision of the Industrial Commissioner is reversed."

It is to be noticed that the judgment of the trial court does not recite that the facts found by the commissioner do not support the award nor that there was insufficient evidence to warrant making the award. (See Code sections 1452 and 1453.)

This court has repeatedly called attention to the functions of the industrial commissioner and the court in cases of this character. Where the facts are in dispute, or where reasonable minds may differ on the inferences fairly to be drawn from the proven facts and circumstances, the findings of the commissioner are conclusive. And this is true even though the court might arrive at a different conclusion from the evidence. If the evidence presents a question which should have been submitted to the jury, if the trial were before a jury, then the court is bound by the findings of the commissioner. Had this case been triable to a jury on the record made before the commissioner, would a directed verdict for the employer have been justified? If so, this case should be affirmed. If not, it must be reversed. West v. Phillips, 227 Iowa 612, 288 N. W. 625; Smith v. Soldiers' and Sailors' Mem. Hosp., 210 Iowa 691, 694, 231 N. W. 490, 492; Flint v. Eldon, 191 Iowa 845, 183 N. W. 344.

■ II. The answer to the application for award was in three separate divisions. The first division consisted of a general denial and a specific denial that decedent sustained injury arising out of and in the course of employment. In the second division it was alleged that death was caused by the wilful intent of

Reddick to injure himself in that he committed suicide. The third division alleged that the proximate cause of injury and death was intoxication. The industrial commissioner held that suicide and intoxication were affirmative defenses and that the burden of proof as to these defenses rested upon appellee. The commissioner was right.

It was of course incumbent upon appellant to prove by a preponderance of the evidence that death was caused by injury arising out of and in the course of employment. This was the issue made by the application for the award and the first division of appellee's answer. If appellant sustained this burden she was entitled to prevail unless appellee succeeded in proving by a preponderance of the evidence one or both of the affirmative defenses of suicide and intoxication. This question is clearly ruled by Everts v. Jorgensen, 227 Iowa 818, 289 N. W. 11. The affirmative defense pleaded in the Everts case was injury caused by the wilful act of a third person within subsection 5-b, of Code section 1421. Injuries caused by the employee's wilful intent to injure himself and by intoxication are excepted from the provisions of the act by Code section 1376 rather than by section 1421. The Everts case, however, plainly indicates (see page 823 of 227 Iowa) that the same rule as to burden of proof there adopted applies to the situation now before us.

We will add to the discussion in the Everts case only the suggestion that somewhat in point is the rule which this court has recognized in negligence cases. It is of course necessary for one claiming to have been injured by the negligence of another to prove that such negligence was the proximate cause of the injury. If anything other than the defendant's negligence was the proximate cause, then plaintiff is not entitled to recover. Different cases hold, however, that where a defendant pleads by way of separate defense that the negligence of some third party was the sole proximate cause of plaintiff's injury, the burden of proof as to such defense rests upon the defendant. Johnson v. McVicker, 216 Iowa 654, 658, 247 N. W. 488; Griffin v. Stuart, 222 Iowa 815, 825, 270 N. W. 442; Usher v. Stafford, 227 Iowa 443, 447, 288 N. W. 432.

III. As stated, the burden was upon appellant to prove that her husband met his death from injury arising out of and

in the course of employment. It is not questioned that decedent was an employee of appellee. Nor do we understand it to be seriously contended that death by the inhalation of carbon monoxide poisoning from the exhaust of the truck was not death resulting from personal injury within the contemplation of the compensation act.

This court has frequently explained the meaning of the term "arising out of and in the course of the employment." See Walker v. Speeder Machinery Corp., 213 Iowa 1134, 240 N. W. 725, and cases therein cited. And see Code section 1421, subsection 6. We believe there is substantial evidence, though circumstantial in character, that Reddick's death occurred in the course of his employment; in other words, at a place where it was his duty to be, at a time when he was properly doing his work and while in the performance thereof. We think the record also presents sufficient evidence that the injury arose out of the employment; that is, a causal connection fairly appears between the conditions under which the work was performed and the resulting injury—the injury followed as a natural incident of the work.

It must be remembered that the garage was the place provided by the employer for the storage of the truck when not in use and to which shipments of merchandise were delivered. It was Reddick's duty to store and care for the truck as well as the goods in the garage, and to unpack and check the newly arrived merchandise. Furthermore, it clearly appears from the manager's testimony that between Saturday afternoon and Monday morning it was Reddick's duty to check the stock on hand and send in an order for the coming week; also that Reddick was "very willing to work extra hours." It was also convenient, if not necessary, for him to make out his reports in the garage, which was the only place of business provided by the company. Claimant, testifying from personal knowledge, said that her husband usually worked Saturday nights and sometimes on Sunday. He was a little more than a day in arrears with his route. It was decedent's duty to start out with the truck on Monday morning and it was necessary that the merchandise be properly placed and arranged in the truck prior to that time. The most reasonable explanation of his

presence in the garage at the time is the performance of his duties.

The above facts bear largely upon "the course of employment" question. The fact that the carbon monoxide gas inhaled by the employee was emitted from the exhaust of the truck in the garage leads to the conclusion that the injury arose out of the employment. At least we think the industrial commissioner was justified in so finding.

IV. Does the evidence disclose as a matter of law that Reddick committed suicide or that intoxication was the proximate cause of his death?

We will first consider the issue of intoxication. We think a preponderance of the testimony fairly shows that Reddick was intoxicated on Saturday night. The commissioner so found. There is no evidence that Reddick did any drinking after midnight, or somewhat later, Saturday night. While in the Dotseth home, between approximately 2 and 5 a. m. Sunday, Reddick slept at least a portion of the time. Dotseth testified, in effect, that when Reddick left his house he appeared to be sober. He drove the truck from the Dotseth home into the Porter garage apparently without mishap.

The fair inference from all the testimony is that death occurred not earlier than Sunday afternoon. There is no direct evidence of how Reddick spent his time after 5 o'clock Sunday morning until he died. Intoxication, in order to be a defense, must have been the proximate cause of the injury (Code section 1376). It is possible there may be some evidence in the record from which the industrial commissioner could have found that the defense of intoxication had been made out. It seems to us, however, a finding that death was caused by intoxication would have been based largely on speculation, conjecture, and mere surmise. Unless we are to hold that evidence that Reddick was intoxicated at 12 o'clock Saturday night establishes as a matter of law that his death (which probably occurred not earlier than the following afternoon) was caused by such intoxication, the judgment of the trial court cannot be sustained on the theory of intoxication.

V. Was the defense of suicide established as a matter of law?

On this issue appellant at the outset had the aid of a presumption against suicide. It is a fact of general knowledge and observation that sane men do not ordinarily seek death but on the contrary at all times try to avoid it. Love of life is strong. Suicide by a rational man is an act of moral turpitude. If the facts surrounding death can be reconciled with any reasonable theory of innocence or accidental cause,. that explanation will be adopted.

Appellee's claim is that the presumption against suicide has been conclusively rebutted. The testimony upon which appellee relies is wholly circumstantial. There are cases holding that the presumption against suicide can be conclusively rebutted by circumstantial evidence. See Warner v. Equitable Life Ins. Co., 219 Iowa 916, 258 N. W. 75; Green v. New York Life, 192 Iowa 32, 182 N. W. 808; Gavin v. Des Moines Life Ins. Co., 149 Iowa 152, 126 N. W. 906; Inghram v. National Union, 103 Iowa 395, 72 N. W. 559. Courts have frequently recognized, however, that it is only in rare cases where this presumption can be dispelled as a matter of law by evidence which is wholly circumstantial. In Michalek v. Modern Brotherhood of America, 179 Iowa 33, 42, 43, 161 N. W. 125, 129, this court says:

"While, in cases where the fact of suicide is so glaring as to afford no possible grounds for dispute, the courts will not hesitate so to hold, yet they are quite infrequent, and especially so where, as here, the conclusion is to be drawn in any material degree from evidence which is purely circumstantial."

In a case upon which appellee relies and from which it quotes extensively in its brief, Ryan v Metropolitan Life Ins. Co., 206 Minn. 562, 571, 289 N. W. 557, 561, it is said:

"In rare cases is the evidence of suicide so persuasive as, not only to dispel the presumption, but also to require decision, as matter of law, that death was not accidental."

In the Michalek case, supra, the trial court was reversed for directing a verdict on the theory of suicide. Other Iowa cases to the same effect are Jovich v. Benefit Assn., 221 Iowa 945, 265 N. W. 632; Wilkinson v. National Life Assn., 203 Iowa 960, 211 N. W. 238, 208 Iowa 246, 225 N. W. 242; Connell v.

Iowa State Trav. Men's Assn., 139 Iowa 444, 116 N. W. 820. Other cases holding that suicide as a matter of law was not established are Waddell v. Prudential Ins. Co., 227 Iowa 604, 288 N. W. 643; Wood v. Sovereign Camp of Woodmen, 166 Iowa 391, 147 N. W. 888; Tackman v. Brotherhood, 132 Iowa 64, 106 N. W. 350, 8 L. R. A., N. S., 974; and Stephenson v. Bankers Life, 108 Iowa 637, 79 N. W. 459. A reading of the above cases makes it clear that it takes a comparatively strong showing of suicide to establish that conclusion as a matter of law, especially on circumstantial evidence.

A considerable portion of appellee's argument is devoted to the proposition that the presumption against suicide has no weight as evidence; that when testimony on the subject is presented, the presumption disappears and the case is to be determined on the evidence. What appellee contends for as to the force and effect of the presumption is stated in 20 Am. Jur., section 166, pages 170, 171, to be the majority view. But the text states "there is authority for the view that the presumption against suicide is to be regarded in the nature of evidence." Appellee concedes in argument that this court has declared itself on different occasions as in accord with the view that the presumption against suicide has the effect of affirmative evidence. Among the Iowa cases so holding are Waddell v. Prudential Ins. Co., Michalek v. Modern Brotherhood of America, Wood v. Woodmen, Connell v. Iowa State Trav. Men's Assn., Tackman v. Brotherhood, and Stephenson v. Bankers Life, last above cited. To the same effect, with regard to a like presumption, are Martin v. Bankers Life, 216 Iowa 1022, 1040, 250 N. W. 220, and Caldwell v. Iowa State Trav. Men's Assn., 156 Iowa 327, 330, 136 N. W. 678. We find no Iowa case to the contrary. We are not prepared to overrule these decisions.

■ We hold that appellee failed to rebut as a matter of law the presumption against suicide and that the finding of the industrial commissioner in favor of appellant is based upon something more than mere conjecture and surmise.

Appellee made a strenuous effort to show a motive for suicide. This showing is based very largely upon testimony of the schoolteacher, Dorothy Hove, of statements claimed to have been made to her by Reddick on the Saturday night pre-

ceding his death, and also upon statements claimed to have been made by appellant. According to Dorothy Hove, Reddick told her something of his troubles with his first wife, how she was untrue to him, that his then wife (appellant) did not approve of the job he had, that he was somewhat suspicious of her, that he sent her $20 each week, that he was disappointed with his work, that he found it difficult to train good men to keep them on the job. Much is made of Reddick's statement to Dorothy Hove and her companion in the taproom that he would not be in Decorah Monday morning to meet the sender of the telegram. Appellant explains this incident on the theory that decedent's work would require him to be on his route on Monday. Much significance is also attached to the incident testified to by Miss Hove that Reddick handed her a nickel and asked her if she would always keep it if she never saw him again. It should be kept in mind that decedent was a "traveling man"; that he had seen Miss Hove but twice and it was not at all unlikely that he would never see her again had he not met his death as he did. It must also be remembered that at the time these statements were claimed to have been made, decedent had been drinking considerably. Furthermore, the young ladies themselves had been drinking.

The statements said to have been made by appellant are in our opinion not persuasive as pointing to suicide. At one time, it does not definitely appear when, it is said that deceased cried at home after criticism from the company's sales manager. Mrs. Seegmiller testified that appellant told her she received a letter from her husband a few days before his death in which he said he was tired of his work and sometimes felt like throwing it up. In addition to the testimony of Miss Hove and of the statements attributed to appellant, one Blagen testified that deceased talked of resigning his job because it was too much of a grind. The findings of the commissioner indicate that he gave careful consideration to all of this testimony. We have carefully reviewed it. The commissioner was unable to find in the record any adequate motive for Reddick to take his life. He apparently was in good health. It is conceded his accounts with the company were satisfactory. Appellee's district manager said:

"We found him an industrious, loyal, sober employee. Very satisfactory. * * * Was being closely watched for future promotion. Very accurate, very conscientious, very willing to work extra hours to finish any assignment."

There is other testimony to the same general effect.

Taking up the physical facts surrounding the tragedy, the only two theories which are suggested as in any way plausible are the theory of appellant that deceased was performing some duty connected with his employment when the deadly gas from the exhaust of the truck overcame him, and the theory of suicide relied upon by appellee. Appellee argues that the position in which the body was found indicates that it was deliberately so placed by the deceased in order to take his own life. Much emphasis is placed upon the papers or bags which were found beneath his body. No tire marks were observed on the paper which lay beneath the head or shoulders. The evidence does not clearly show, however, that the paper was in such position the tire could have passed over it. There is substantial testimony as to the presence of several papers or paper bags on the floor of the garage. There is testimony from which it could fairly be found that deceased had paper bags in or near his hands at the time. In view of the entire record, we are unable to attach controlling importance to the presence of the papers beneath the body.

It is doubtless a vital question whether decedent voluntarily assumed the position in which he was found. If he did, that would be a circumstance pointing to suicide, although we are not prepared to say it would necessarily be conclusive of the question. Even though there were no bruises nor abrasions upon the body and no tears in the clothing, we cannot say but what the reasonable inferences to be drawn from all the testimony lead to the conclusion arrived at by the commissioner that decedent 'fell or in some other way did not voluntarily assume the position in which his body was found. There is considerable testimony that Reddick's coat was pulled up around his neck and shoulders and caught against the door. He was in anything but a comfortable position. The testimony shows beyond dispute that in order for decedent to fasten the garage doors at the top, it would be necessary for him to stand upon some object. He would be most apt

to stand upon the rear bumper of the truck. The doors were closed. Some of the witnesses testified they were fastened at the top but not at the bottom, while there was testimony that the top was not fastened. As we have previously pointed out, it is entirely reasonable to conclude that deceased was in the act of performing some service for his employer at the time.

It must be conceded that if it were Reddick's purpose to take his life in a hurry from carbon monoxide, he would probably have closed the side door to the garage, which all the testimony showed was open. Appellee's explanation of this is:

"In taking his own life, Reddick no doubt had this door closed and it in all probability blew open sometime prior to the discovery of the body."

There is no testimony that the door was closed. We think the above argument is a resort to conjecture and speculation.

Experts testified to the effects of carbon monoxide gas. One doctor testified:

"Men in close quarters like that and exposed to carbon monoxide gas are frequently overcome by accident before they know it. * * * When a man gets a dose of it he is overcome without really knowing it is affecting him at times. It does not signal a warning to get out. He is very often succumbed before he could physically manage himself to get out. A man is apt to be out on his feet before he knows what happens. * * * They might go into a room where a motor was running and not realize the danger and then drop."

We do not undertake to say the precise manner in which this man met his death. It is not our province to do so. In our judgment, however, the finding of the commissioner that death was not caused by suicide has support in the evidence, and the reasonable inferences to be drawn therefrom. See Bushing v. Iowa Ry. & L. Co., 208 Iowa 1010, 226 N. W. 719. In this connection we are impressed with the language of this court in Jones v. Eppley Hotels Co., 208 Iowa 1281, 1287, 227 N. W. 153, 156:

"Possibly the commissioner was wrong in his decision. Another result might or might not have been reached by us, had it

been our duty to make a finding. That is not the question. There was substantial evidence in the record, and it was the province of the commissioner to say with whom it preponderated."

The trial court erred in reversing the award of the commissioner and its judgment is reversed.—Reversed.

HALE, C. J., and MITCHELL, SAGER, BLISS, OLIVER, MILLER, and WENNERSTRUM, JJ., concur.