BEULAH L. SCHOFIELD, administratrix of estate of Melvin J. Schofield, deceased, claimant-appellee; v. ROLLIN S. WHITE et ux., formerly d/b/a WHITE FURNITURE STORE, employer, and AMERICAN AUTOMOBILE INSURANCE COMPANY, insurance carrier, appellants.

No. 49514.

(Reported in 95 N.W.2d 40)

572

FEBRUARY 10, 1959.

R. E. Killmar and W. W. Reynoldson, both of Osceola, for appellants.

Holliday, Miller, Myers & Stewart, by James M. Stewart and William S. Wimer, all of Des Moines, for appellee.

GARRETT, J.—It is alleged in this case that for some ten years prior to his death, Melvin J.. Schofield was in the employ of Rollin S. White, doing business as White Furniture Store in the town of Lamoni, Iowa, and that on the morning of Monday, April 21, 1952, while he was engaged in carrying folding chairs from the basement of the furniture store where he worked to the display rooms upstairs, and after he had gone some distance up the stairs, carrying six chairs on each arm, he lost his balance and fell backwards upon the cement floor and sustained severe injuries. One week later, while under a doctor's care, soon after eating his lunch he went to his bedroom, locked the door and took his life by firing a 22-caliber bullet into his head at a point slightly anterior to the upper part of his right ear.

When Mrs. Schofield, claimant, heard what she thought was the report of a rifle shot she went to the door of the bedroom and, finding it locked, called her brother who lived near by. When he arrived and opened the door he found Schofield's lifeless body lying on the floor, his rifle partly under his body and pointing away from him and a half-burned and still burning cigarette under his leg. Claimant, upon filing her petition, assumed the arduous task of proving by competent evidence that the injuries sustained by her husband, when he fell and struck his head on the basement floor, were the proximate cause of his later taking his life. The defense was that there was no causal connection between the death caused by the gunshot wound and the prior on-the-job injury. On arbitration hearing the deputy industrial commissioner, as sole arbitrator, awarded compensation. On review, the commissioner held there was a causal connection between the injury on April 21, 1952, and the death on April 28, 1952, designated the widow, Beulah S. Schofield, as the claimant and awarded compensation. On appeal the district court affirmed the commissioner.

The employer stated the errors relied on for reversal as follows:

"(1). That the decision and award of the commissioner is not supported by substantial evidence. That the facts found by the commissioner do not support the decision and award. That the facts found by the commissioner (1) that the death by gunshot wound on April 28, 1952, was suicidal, rather than

accidental, (2) that the suicide was involuntary, (3) that the employee underwent a change of personality and mental derangement from an on-the-job accident of April 21, 1952, and (4) that there was a causal connection between the on-the-job accident, and the subsequent death by suicide, are not supported by sufficient competent evidence and must be set aside.

"(2). The ultimate finding by the commissioner was a conclusion of law. There was no material conflict in the evidence as to the controlling facts. If the conclusion is one of fact, it is unsupported by sufficient competent evidence to warrant the decision and order. That the district court erred in failing to reverse the award.

"(3). The commissioner erred in allowing compensation to the surviving spouse, because no proceeding for compensation was commenced by her within two years from the date of the injury causing death. Her claim was barred by the special statute of limitations included as a part of the act."

I. Section 86.29, Code, 1958, provides: "* * * In the absence of fraud the findings of fact made by the industrial commissioner within his powers shall be conclusive." Section 86.30, Code, 1958, is as follows:

"86.30 Decision on appeal. Any order or decision of the industrial commissioner may be modified, reversed, or set aside on one or more of the following grounds and on no other:

"1. If the commissioner acted without or in excess of his powers.

"2. If the order or decree was procured by fraud.

"3. If the facts found by the commissioner do not support the order or decree.

"4. If there is not sufficient competent evidence in the record to warrant the making of the order or decision."

 We said, in Featherson v. Continental-Keller Co., 225 Iowa 119, 120, 121, 279 N.W. 432, 433: "As a general proposition it will not be denied that the finding of the industrial commissioner on disputed questions of material fact is conclusive upon this and the district court. Our views were well expressed by Powers, J., in Shepard v. Carnation Milk Co., 220 Iowa 466, appearing at pages 469, 470, 262 N.W. 110, 112, in this language:

'In the consideration of this question, the limitation upon the power of the court in compensation cases must be kept clearly in mind. The purpose of the enactment of such legislation was to avoid litigation, lessen the expense thereof, and afford an efficient and speedy tribunal to determine and award compensation. Flint v. City of Eldon, 191 Iowa 845, 183 N.W. 344. To that end the act provides that, in the absence of fraud, the findings of the industrial commissioner on the facts are conclusive. The act contemplates that all controversy over disputed questions of fact shall end with the findings of the industrial commissioner. Section 1452, Code 1931. It is not the province of the court to review the evidence and determine whether or not it believes that the industrial commissioner reached a correct conclusion on the facts. We may well repeat here what we said in the case of Flint v. City of Eldon, supra, by way of quotation from a New York case (Rhyner v. Hueber Bldg. Co., 171 App. Div. 56, 156 N. Y. S. 903) :

' "It was the purpose of the legislature to create a tribunal to do rough justice—speedy, summary, informal, untechnical. With this scheme of the legislature we must not interfere; for, if we trench in the slightest degree upon the prerogatives of the commission, one encroachment will breed another, until finally simplicity will give way to complexity, and informality to technicality."

'The task of the court is to enforce this legislative scheme, not to interfere with it. If, therefore, there is evidence from which the industrial commissioner could have found as he did, the court must not interfere with such findings. Section 1453, Code 1931.' "

More recent support for this proposition may be found in City of Emmetsburg v. Gunn, 249 Iowa 297, 86 N.W.2d 829, and cases cited therein.

II. The employer challenges the finding by the commissioner that the death by gunshot wound was suicidal rather than accidental. No compensation shall be allowed for an injury caused by the employee's wilful intent to injure himself. Section 85.16, Code, 1958; Reddick v. Grand Union Tea Co., 230 Iowa 108, 296 N.W. 800. Suicide, where wilful intent is present, is clearly a bar to compensation. Nor will

compensation be allowed where death results from an accident in no way connected with the employment. In the absence of direct evidence a presumption arises that a wound was not intentionally inflicted either by the person injured or by another. The presumption against suicide has the effect of affirmative evidence. Holloway v. Bankers Life Co., 248 Iowa 517, 81 N.W.2d 453; Reddick v. Grand Union Tea Co., 230 Iowa 108, 296 N.W. 800.

In this case there was ample evidence to justify the commissioner in finding that Schofield's death resulted from suicide, as will be shown by facts hereinafter set out. Was there sufficient competent evidence to justify the commissioner in finding that the employee underwent a change of personality and mental derangement from the on-the-job accident on April 21, 1952, that the suicide was involuntary and that there was a causal connection between the on-the-job accident and the subsequent death by suicide? The facts are not in material dispute. The controversy concerns the inferences to be drawn therefrom. The evidence disclosed that when Schofield fell backward down the basement stairs in his employer's store, his head struck the concrete floor at the foot of the stairs. That he was rendered unconscious, and when Dr. E. E. Gamet arrived he found Schofield in a semiconscious state, moaning, restless, nervous, twitching, complaining of his head hurting him and of feeling tired. The doctor's diagnosis at that time was "mild concussion." Schofield was in bed until Wednesday. He attempted to work on Thursday but was unable to do so. Saturday he helped lay a carpet or rug at a church.

A fellow worker, Dave W. Cook, testified: "On that afternoon, he didn't seem to be himself, and he acted as though he had his mind on something else besides the work he was doing, and he couldn't think how to cut the corners to make them come around, and such as that. He would be standing there staring when you would look up at him."

There was evidence he had previously been experienced and skillful at laying carpet. At home he sat around, staring, holding his head, was very nervous, could not stand noise, and had no interest in things. His wife testified, "There wasn't anything he did all week that was like he would usually do." On

the morning of the day he died he went for a ride. She further testified that when he walked into the house she knew he looked funny and she could tell he was sick, and that prior to his fall he was in good health and of cheerful disposition, that he took a keen interest in his family, his home, his outdoor activities such as fishing and hunting, was friendly and liked to talk to people. She stated this was all completely changed after his fall. Asked about how her husband looked or appeared to her shortly before he was found dead she stated he appeared to be in a daze. He had had sinus trouble and was operated upon for it in 1945, sought medical aid occasionally thereafter, but was generally in good health before the fall, that he was 36 years of age and weighed around 150 pounds.

Dr. Walter D. Abbott, a specialist in neuro-surgery, of Des Moines, in answer to a hypothetical question testified it was his opinion there was a causal relationship between the injury and the personality change and that there was some aberration or derangement in Schofield's mind at the time of his taking his life. He further testified that a person after having a mild concussion such as was described to him in this hypothetical question might have a personality change within a few hours, days, weeks or months: "Q. Doctor, in your opinion, was there any pathological change in this man's head which caused him to commit suicide? A. Assuming he was well before he had the brain injury, yes." He further testified it was his opinion that at the time a person actually commits a suicidal act he is of unsound mind and that all suicides are committed by people who are momentarily insane at the time they perform the deed: "Q. Well, Doctor, would the swelling in the brain or the hematoma induce the suicide? A. If it involved certain parts of the behavior and personality it could take the brakes off and allow the person to perform an involuntary act."

Dr. Paul T. Cash, called by the defendant, after qualifying as an expert in neurology and psychiatry testified: "Suicide is the result of a process that goes from loss of interest to inability to enjoy life entirely, to indifference as to whether or not an individual cares to live, and finally an actual desire to die, they would much rather be dead than live, and when

that feeling is strong enough it is very easy for them to accomplish it by their own hand."

On cross-examination he testified: "Q. Now, if a person is depressed and he has an aggravation of a pain of that kind, I presume that could be the final thing that pushes him over the brink, could it not? In other words, you say depression may be a concurrence of a lot of different factors, that being one of them, isn't that true? A. That's right. Q. What are some of the characteristics of behavior after a person suffers from a brain injury that are abnormal and which would indicate some change to the brain? A. Well, that varies a great deal depending upon the extent of the damage and the location of the damage. Probably the most common delayed effect is what we call a post-traumatic cerebral syndrome where after an injury or brain disease a person may gradually become irritable and easily fatigued, have difficulty with memory and complain of headache and dizziness and insomnia, and oftentimes they are unable to focus their attention and have interest like they should have, so that this is something that develops over a period of time. The other effects of an injury would depend entirely upon the location and extent of the injury. Q. Let us assume the hypothetical facts given you, but with this change: that this man was a man of happy and jovial disposition prior to the time of this accident on the stairway, and loved to go hunting and fishing and converse with friends, and was a good companion on hunting and fishing trips and took pleasure in doing things with his family and work around the house, and had a radio on all the time and enjoyed the music and sometimes tried to learn the songs. And you have that history of the man down to the time he suffered from this concussion of the brain and is bedridden for three days. And then the change is so pronounced that it is observed by his relatives and his wife and in-laws and all of a sudden he becomes irritable, can't stand the children around, can't stand the music on, complains of headaches and can't sleep at nights. For example, the Monday morning prior to that his wife heard him up at 4 o'clock in the morning and around the house, and his wife tries to quiet him down, and later on in the morning observes to him, 'You are sick', and she says 'Who shall we go to, what doctor?' and he

said 'Well let's go to Dr. Gamet', and they tried three times that day to see the doctor, once at 10 o'clock, once at 11 o'clock and once at 1 o'clock and the doctor wasn't in, and then he suddenly takes his life. Now, taking those factors into consideration, do you think that the injury he sustained in that fall had something to do with the state of his mentality, his mind, state of mind, on that Monday? A. I would say that if there is a pronounced change of this description from the time of the injury we would have to conclude that the injury was an important factor."

Doctor Cash defined personality change as follows: "A. It is not a very easy question to answer. Your personality actually consists of all the physical and mental attributes of an individual as they react in rather characteristic fashion to any given situation, which means you have to take into account the nature of the individual, his previous personality, and then specify the changes in his physical and mental reactions to any one given situation in order to describe a personality change, and that, of course, can include a great deal; I mean it covers a large territory."

Doctor Cash responded to a hypothetical question propounded by the defendant stating that the decedent suffered from serious headaches and periodic illnesses and nervousness as far back as 1945, when he was operated upon for sinus trouble, that it was his opinion the suicide, if it was such, was due to prolonged emotional depression.

There was other medical testimony elicited by hypothetical questions and expert opinion given that there was no causal relation between the fall and the death by gunshot wound.

The commissioner found: "The claimant has established an unbroken chain of events flowing logically from the employment injury to the death, and that the injury was the proximate cause of the decedent taking his own life. The causal effect attributable to the injury is not overpowered or nullified by evidence of influences originating entirely outside the employment. If, prior to the injury, the decedent had been depressed and had a predisposition to suicide, this injury could very well have acted as a catalysis and precipitated the events leading to suicide, but the evidence does not show such predisposition even

though the evidence is in conflict as to what his health, personality and attitudes were prior to the injury. It is clear that the decedent became mentally deranged because of brain injury and as a direct result thereof involuntarily took his own life.

"The expert testimony that there was a brain injury here is supported by the direct evidence of a head injury and concussion followed by immediate disability and definite personality change. Because there is a direct measurable causal connection between the injury and the self-inflicted gunshot wound, it cannot be said that the death was the result of an accident. There was no evidence though that the suicide was planned. The facts that he attempted to return to work and tried to continue his negotiations for purchase of his own business and unsuccessfully sought medical attention immediately prior to his death, and the absence of a suicide note and the locked door, all tend to show that this suicide was a spontaneous unpremeditated act. It is clear therefore that this suicide was not the result of a wilful intention to injure himself, but rather was the product of a mental derangement, and was not a voluntary act."

The findings of the commissioner must be affirmed if there is sufficient competent evidence in the record to warrant his decision.

We said in Bocian v. Armour & Co., 244 Iowa 304, 308, 56 N.W.2d 900, 903: "We have quoted enough to establish the conflict in expert opinion which confronted the commissioner. It is not our province to weigh it. We can merely determine whether there is substantial, competent evidence to support his finding. The rule applies where there is a conflict in expert opinion. Reynolds v. George & Hoyt, supra, 230 Iowa at page 1271; Eveland v. Newell Constr. & Mach. Co., 236 Iowa 204, 17 N.W.2d 524.

"Nor do we deem the difference of opinion shown in the record as to the cause of claimant's condition requires for its solution a conclusion of law as distinguished from a finding of fact. We realize the differentiation is not always easily made as suggested in Mallinger v. Webster City Oil Co., 211 Iowa 847, 234 N.W. 254, quoted in Marley v. Orval P. Johnson & Co., 215 Iowa 151, 157, 244 N.W. 833, 85 A. L. R. 969 (cited

by claimant). Under the record here the cause could only be ascertained by inference from the facts shown. That means, not a process of legal reasoning or conclusion, but one by which a fact is sought to be established or deduced as a logical consequence from other facts. 43 C. J. S., Inference, page 373 et seq."

 From a careful examination of the record, and particularly the testimony of the medical experts, we are convinced that there was sufficient competent evidence to sustain the commissioner's decision.

"The American cases generally have adopted the rule that where insanity and suicide follow an injury to a workman which was otherwise compensable, compensation may be awarded if he took his own life through an uncontrollable impulse, or in a delirium of frenzy, and without conscious volition to cause death, since under such circumstances there was a direct and unbroken causal connection between the injury and the suicide and no intervening cause. But where suicide on account of the consequences of a compensable injury results from a voluntary wilful choice determined by a moderately intelligent mental power which knows the purpose and physical effect of the suicidal act, even though the choice is dominated by a disordered mind, there is a new and independent agency which breaks the chain of causation arising from the injury, and no compensation can be had." 58 Am. Jur., Workmen's Compensation, section 262.

See also Barber v. Industrial Commission, 241 Wis. 462, 6 N.W.2d 199, 143 A. L. R. 1222.

This case presents a new issue not heretofore decided by this court. Claimant, having pleaded and proved suicide, must get around the statutory provision that compensation shall not be allowed for an injury caused by the employee's wilful intent to injure himself. To do this she must prove the mental condition of her decedent at the time of the suicidal act was such that he was motivated by an uncontrollable impulse or in a delirium of frenzy, without conscious volition to produce death. To do this medical experts were called to show what inferences might fairly be drawn from the facts presented.

Claimant stated that in the morning of the day he died, her husband was concerned about completing his arrangements

to buy the bottled gas business; that he left home and came back about 9:30. She did not think he intended to work that day. He and she drove to the doctor's office at ten o'clock, then out into the country and back to the doctor's office at eleven. Not finding the doctor in they went home and ate lunch with their three children, then went again to the doctor's office. Her husband drove the car each time. She said, describing his condition, he seemed to be in a daze. After lunch while she was doing the dishes he went to his room and took his life. She testified he had never made any statements to her that he might take his life. That was the furthest thing from her mind.

Doctor Abbott testified: "I think if there is a personality change, it's obvious that there would be some aberration from the average mental process. Q. State, Doctor, whether or not, in your opinion, on the basis of the facts recited, you think that there was some aberration or derangement in the case of this patient at the time of his taking his life? A. Yes. Q. State whether or not, Doctor, in your opinion, on the basis of the facts recited, such derangement, which you believe existed at the time he took his life, was a natural result from the injury sustained by him the preceding Monday when he fell down the stairs? A. I could not say that it specifically was, but I would say that it probably was."

The medical experts were called upon for their opinions based on the facts presented to them. Only one doctor saw the decedent after his fall.

In Lindeken v. Lowden, 229 Iowa 645, 659, 295 N.W. 112, 119, we said: "In this case, witnesses designate the alleged cause as the probable cause, or that which did cause the death. The cause is removed from the realm of mere possibility, and is definitely placed in the field of reasonable likelihood and probability. * * * The vital question with such testimony, as with all other testimony, is whether it is trustworthy, convincing, and supported by sound reasons. If it is, it should receive thoughtful, conscientious, and unprejudiced consideration."

In Reynolds v. George & Hoyt, 230 Iowa 1267, 1271, 300 N.W. 530, 532, we said: "This court has repeatedly held that where the facts are in dispute, or where reasonable minds may differ on the inferences to be drawn from the proven facts and

circumstances, the findings of the commissioner are conclusive. If the evidence presents a question which should have been submitted to a jury, if the trial were before a jury, then the court is bound by the findings of the commissioner."

See also Henderson v. Iles, 248 Iowa 847, 853, 82 N.W.2d 731.

The findings and award of the commissioner are supported by substantial competent evidence and the trial court did not err in affirming them.

III. Defendants claim the commissioner erred in allowing claimant to become a party after the two-year limitation expired. The commissioner's ruling was correct.

"The general rule is that unless an amendment to a petition bringing in a new party plaintiff states facts giving rise to a different and independent legal obligation against defendant or changes the liability sought to be enforced the amendment will be allowed after the statute has run." Iowa National Mut. Ins. Co. v. Chicago, B. & Q. R. Co., 246 Iowa 971, 981, 68 N.W.2d 920, 927; 8 A. L. R.2d 6.—Affirmed.

All JUSTICES concur.