HUMBOLDT COMMUNITY SCHOOLS
and EMC Insurance Companies,
Appellants,

v.

Elizabeth Suzanne FLEMING, Sur-
viving Spouse of David Charles
Fleming, Appellee.

No. 98–427.

Supreme Court of Iowa.

Dec. 22, 1999.

D. Brian Scieszinski and Michael L. Mock of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellants.

Michael J. Galligan of Galligan, Tully, Doyle & Reid, P.C., Des Moines, and Steven K. Sandblom of Baker, Johnson & Sandblom, Humboldt, for appellee.

Considered by McGIVERIN, C.J., and LARSON, CARTER, CADY, and ANDREASEN,* JJ.

LARSON, Justice.

David Fleming committed suicide while he was employed as superintendent of the Humboldt Community Schools. His widow received workers' compensation benefits on the basis his death was caused by job stress, and the award was affirmed on judicial review. The employer and its workers' compensation insurance carrier, EMC Insurance Companies (collectively Humboldt Schools), appealed. We affirm.

## I. *Facts.*

Fleming began his employment at Humboldt Schools in 1983 as a principal. From 1989 until his death in June 1993 he was the school superintendent. The job stress allegedly leading to Fleming's death arose largely from his advocating the concept of outcome based education (OBE), an educational approach that identifies outcome goals in education and tailors curriculum to meet those goals. The concept was very controversial in the community. Public meetings on the issue became very heated, and Fleming became the focal point of community criticism. In the spring of 1993, Fleming began displaying symptoms of depression, including weight loss, insomnia, indecisiveness, and withdrawal. He became less organized, and he had trouble concentrating. On June 6 he had an acute anxiety or panic attack and began receiving psychiatric treatment from Dr. Josefina Hizon. He took antidepressant and antianxiety medications. During this period, the school board abandoned OBE on Fleming's recommendation. Just prior to Fleming's death, he talked to his wife and doctor about a possible suicide. On June 26, 1993, he committed suicide by carbon monoxide poisoning.

After Fleming's death, his widow filed this claim for workers' compensation benefits against the school district. At the administrative hearing, Dr. Hizon testified that Fleming's suicide was the result of depression, caused by stress associated with work, especially the OBE controversy. This opinion was shared by Dr. Robert Litman, a psychiatrist with special interest and knowledge in suicidology, and Dr. David Clark, a psychologist who has taught and written extensively on the subject. Humboldt Schools, resisting the workers' compensation claim, produced Dr. Bruce Danto, a psychiatrist who has studied and written on suicide. Dr. Danto

* Senior judge assigned by order pursuant to Iowa Code section 602.9206 (1999).

testified that Fleming's depression was not caused by work but by a personality disorder and a history of growing up in a dysfunctional family.

The superintendents of several small school districts testified about the stresses experienced by them. They testified that controversies of a magnitude similar to OBE occasionally occurred. However, issues as controversial as OBE are so extraordinary that one superintendent had experienced only three or four like it over a sixteen-year period; another superintendent had only one comparable experience in twenty years. The deputy industrial commissioner found that the claimant had established her claim by showing that the job stress experienced by Fleming was greater than the routine job stress faced on a daily basis by similarly situated school superintendents and that this stress caused the depression resulting in Fleming's suicide. *See Dunlavey v. Economy Fire & Cas. Co.*, 526 N.W.2d 845, 857 (Iowa 1995). On appeal the chief deputy industrial commissioner affirmed the arbitration decision. Humboldt Schools was ordered to pay weekly benefits of $708.96 and $5164.00 in funeral and medical expenses. The district court affirmed.

The first issue is whether this claimant is entitled to workers' compensation benefits in view of the fact Fleming took his own life. The second issue concerns Humboldt Schools' attempt to obtain a lien against the suit proceeds of a medical malpractice suit against Dr. Hizon to indemnify it for the workers' compensation benefits it had paid. *See* Iowa Code § 85.22(1) (1997).

## II. *The Workers' Compensation Award.*

■ Judicial review of decisions by the industrial commissioner is on error, and courts are bound by the agency's factual findings if they are supported by substantial evidence. *Gates v. John Deere Ottumwa Works*, 587 N.W.2d 471, 474 (Iowa 1998); Iowa Code § 17A.19(8)(f).

Under workers' compensation law employers shall pay compensation "for any and all personal injuries sustained by an employee arising out of and in the course of the employment...." Iowa Code § 85.3(1) (1993). In *Dunlavey* we held the term "personal injuries" includes a mental injury without an accompanying physical injury under certain circumstances. We held:

> [I]n order for an employee to establish legal causation for a nontraumatic mental injury caused only by mental stimuli, the employee must show that the mental injury "was caused by workplace stress of greater magnitude than the day-to-day mental stresses experienced by other workers employed in the same or similar jobs," regardless of their employer.

*Dunlavey*, 526 N.W.2d at 857 (quoting *Graves v. Utah Power & Light Co.*, 713 P.2d 187, 193 (Wyo.1986)). We labeled this the "unusual stress" standard and listed three reasons for adopting it: (1) it strikes a balance by providing employees with benefits for work-related losses while placing limits on the amounts the employer must pay, (2) it limits the scope of similar jobs against which to compare the worker's stress, and (3) recovery is further limited by requiring a stress level greater than that of similarly situated employees. *Dunlavey*, 526 N.W.2d at 857–58. Humboldt Schools argues that the stress alleged by this decedent was not unusual compared to that faced by other superintendents, and the claim thus fails the test of *Dunlavey*.

## III. *The Legal Test.*

■ Humboldt Schools contends the commissioner applied the wrong test, saying:

> Humboldt Schools argues that the legal standard in this case is not whether the alleged job stress is greater than the routine everyday job stresses faced by that particular superintendent. Instead, Humboldt Schools contends that the cor-

rect legal standard is whether the alleged job stress is unusual as compared to stresses normally faced from time to time by other superintendents.

This, however, was not the test applied by the commissioner's ruling. It stated the test as follows:

> Under *Dunlavey,* legal causation exists if these stresses and tensions, when viewed objectively and not as the employee perceives them, were of greater magnitude than the day-to-day mental stresses workers employed in the same or similar jobs experience routinely regardless of employer.... Evidence of the stresses of other workers employed by the same employer in the *"same or similar jobs* will usually be most persuasive and determinative on the issue."

(Quoting *Dunlavey,* 526 N.W.2d at 858.)

The latter is an accurate statement of the principles underlying mental-injury claims as set out in *Dunlavey,* that is, whether the mental injury was caused by workplace stress of greater magnitude than the day-to-day mental stress of other workers in the same or similar jobs. *Dunlavey,* 526 N.W.2d at 857. We reject Humboldt Schools' argument that the commissioner applied the wrong legal test.

## IV. *The Intentional–Injury Defense.*

Humboldt Schools contends that irrespective of whether the *Dunlavey* test was met, this claimant cannot recover because the death of her husband was self-inflicted. (*Dunlavey* did not involve a self-inflicted injury.) Iowa's workers' compensation law does not provide benefits for an injury caused "[b]y the employee's willful intent to injure the employee's self or to willfully injure another." Iowa Code § 85.16(1). Prior to 1993 suicide was only compensable if the "mental condition of [the] decedent at the time of the suicidal act was such that he was motivated by an uncontrollable impulse or in a delirium of frenzy, without conscious volition to produce death." *Schofield v. White,* 250 Iowa 571, 581, 95 N.W.2d 40, 46 (1959). No

such showing was made in this case. However, the stringent test of *Schofield* has been abandoned. In *Kostelac v. Feldman's, Inc.,* 497 N.W.2d 853 (Iowa 1993), we held suicide would be compensable on proof of causation directly linking an employment injury to a worker's loss of normal judgment and domination by a disturbance of the mind. *Kostelac,* 497 N.W.2d at 856–57.

Humboldt Schools argues that the chain-of-causation test under *Kostelac* requires that a job-related injury was caused by a "deranged mental state which, in turn, caused the suicide," citing *Kostelac,* 497 N.W.2d at 857. The basis of the schools' argument is that in *Kostelac* we cited 1A Arthur Larson, *The Law of Workmen's Compensation* § 36.00 (1985) [hereinafter Larson], which said "if the will itself is deranged and disordered" causation may nevertheless be found in suicide cases.

The term "derangement," we believe, is too nebulous to adopt as a prerequisite to recovery. One dictionary defines derange as to "disarrange," to "put out of place or order," or "to disturb the operation or function of...." Webster's Third New International Dictionary 607 (unabr. ed.1986). The closest this dictionary definition comes to describing a mental condition is to say deranged means "crazy" or "insane," *id.,* terms that are themselves too broad to be of any usefulness for our purpose.

Professor Larson suggests that "derangement," as used in the causation test adopted by us in *Kostelac,* is not a psychiatric term of art but is a general term similar to "disordered," as evidenced by the fact he uses the words simultaneously:

> If the sole motivation controlling the will of the employee who knowingly decides to commit suicide is the pain and despair caused by the injury, and if the will itself is *deranged and disordered* by these consequences of the injury, then it seems wrong to say that this exercise of will is "independent," or that it breaks

the chain of causation. Rather, it seems to be in the direct line of causation. 2 Arthur Larson, *Larson's Worker's Compensation Law* § 38.03, at 38–13 (1999) (emphasis added) (citing *Whitehead v. Keene Roofing Co.,* 43 So.2d 464, 465 (Fla. 1949)).

Most important, *Kostelac*'s causation test does not require a showing of derangement. It says:

> We are persuaded that this shift in emphasis from proof that an employee acted in an impulsive, frenzied state to proof that but for an employment-related mental injury—however experienced—the employee would not have committed suicide, is a more sound way of dealing with the "willful injury" issue of [Iowa Code] section 85.16(1).

*Kostelac,* 497 N.W.2d at 857.

We conclude the industrial commissioner and the district court applied the correct legal test under *Kostelac* for avoiding the self-imposed-injury defense of Iowa Code section 85.16(1) and properly refused to require a showing of derangement.

## V. *Sufficiency of the Evidence.*

In a "mental/mental" injury case (a mental injury without an accompanying physical injury), a claimant must show both a factual and legal causation. The claimant must show the job caused the mental injury (the factual causation) and that the mental injury was caused by stress of a greater magnitude than the day-to-day stress experienced by workers in the same or similar jobs (legal causation). *See Dunlavey,* 526 N.W.2d at 853–54. The question before us is whether the industrial commissioner's findings on these elements are supported by substantial evidence. *Gates,* 587 N.W.2d at 474.

A. *Factual causation.* The connection between Fleming's job-related stress and his suicide is well supported in the record. Three mental health professionals, including two leading authorities on suicides, testified that Fleming's suicide was caused by job-related stress. Fleming's weight loss, lack of sleep, self-doubt, sense of losing control, loss of appetite, social withdrawal, and crying were seen as objective signs of severe depression. One of the experts testified that suicide is usually caused by one of four factors: major depression, alcoholism, drug abuse, or schizophrenia. Only one factor, depression, appeared to fit in Fleming's case. This witness testified:

> [T]here's ... a characteristic experience of profound discouragement and passivism about things working themselves out so that the solution suicide almost becomes attractive and seductive to people in that position.

Another suicide expert testified that

> depressed people almost universally start to have thoughts about suicide, about death. They think about suicide as a solution to the problems they are having, usually very painful thoughts involving loss, guilt and a sense of worthlessness. They will even start thinking that the family would be better off without them.... [A]nd when that becomes severe, we call it a major depressive episode or a major depressive disorder.

Humboldt Schools introduced evidence of other possible reasons for the suicide, including grief over the death of a family friend, Fleming's childhood in a dysfunctional family, a family history of mental problems, and possible depression over his knee problems. This evidence, however, was rejected by the industrial commissioner. We believe that the findings as to factual causation were established by substantial evidence.

B. *Legal causation.* Humboldt Schools' principal attack is that, as a matter of law, the claimant failed to meet *Dunlavey*'s test for legal causation, because she failed to show her husband's stress was of greater magnitude than the day-to-day mental stress experienced by other workers in the same or similar jobs.

The claimant's evidence included testimony by six superintendents, from comparable school districts, with six to twenty-six years of experience. The superintendent with twenty-six years' experience, Richard Textor, described a superintendent's job as being mostly administrative. His most stressful experience involved school closings. However, a community controversy of the magnitude experienced by David Fleming, in connection with OBE, would be unusual, according to him.

Another superintendent, Robert Olson, had six years' experience and had been involved in a fight over OBE in 1995. He characterized it as the most stressful experience of his job. OBE-related stress would be greater than the usual stress associated with the job, according to him. Kenneth Shaw, a twenty-one-year superintendent, testified OBE-based issues created much more stressful conditions than those involving day-to-day administration. Other superintendents testified similarly.

The deputy industrial commissioner summarized the testimony of these superintendents and referred as well to the additional dimension of the impact of the OBE controversy on Fleming's personal and religious life. (There was testimony that telephone calls directed at OBE issues were made to the Fleming home, where his family became involved; in addition, Fleming's deeply held Christian beliefs were publicly questioned.) The deputy concluded:

> From the evidence presented, it is ... found that the stress experienced by David, especially from the OBE controversy, when viewed objectively and not as David perceived them, were of greater magnitude than the day-to-day mental stresses school administrators or school superintendents experience routinely. The parties in this case deposed no less than seven other school superintendents from around the state located in similar rural or small community school districts. Although all of them described their own personal experi-

ences with local school controversies, including OBE, all agreed that the type of stress and the personal attacks David experienced were unusual compared to the day-to-day stresses they routinely experience in their jobs. Their day-to-day routine stresses involve general administrative duties; working more than a 40–hour week; dealing with the public; conducting meetings; handling personnel problems; and coping with budget problems. However, the enormous time and concentration involved in having to deal with a full-blown public controversy and highly personal attacks, even to the extent of attacks on his religious beliefs, were beyond the norm and extremely stressful and difficult to handle even for school district superintendents.

Humboldt Schools points to two post-*Dunlavey* cases to support its argument that the proof did not meet the test we adopted in that case. Those cases are *City of Cedar Rapids v. Board of Trustees*, 572 N.W.2d 919 (Iowa 1998), and *Moon v. Board of Trustees*, 548 N.W.2d 565 (Iowa 1996). In those cases, we extended the *Dunlavey* test to police officers' claims for accidental disability benefits under Iowa Code chapter 411.

Both *City of Cedar Rapids* and *Moon* involved claims for mental/mental injuries in the context of police officers' work. The issue was whether those officers' work and the stress they experienced satisfied the *Dunlavey* test. Humboldt Schools points to the fact that *Moon* denied recovery for an alleged mental/mental injury because the claimant failed to establish the incidents relied on were of greater magnitude than the day-to-day mental stress experienced by other police officers. *Moon,* 548 N.W.2d at 569. In *Moon,* however, we did not engage in a qualitative analysis of the evidence (mainly testimony by other officers comparing claimant's experience with day-to-day experience of other officers). Rather, recognizing the closely circumscribed scope of our review in such cases, we looked at the record to see if

substantial evidence supported the agency's decision which was to deny benefits. We held it did. *Id.* at 569–70. In *City of Cedar Rapids* we held substantial evidence supported the board's finding that the claimant had established his case. *City of Cedar Rapids*, 572 N.W.2d at 925–26. Neither *Moon* nor *City of Cedar Rapids* control our disposition here; those cases turned solely on the question of whether the record supported the finding of the agency. In both cases we held that it did.

In the present case we believe there is substantial evidence in the record to support the industrial commissioner's finding under the *Dunlavey* test. Therefore, we affirm the district court on that issue.

## VI. *The Record Supplementation Issue.*

■ Humboldt Schools contends the district court abused its discretion in not allowing it to supplement the record in the judicial review proceeding to show an intervening settlement of approximately $2 million in the Fleming Estate's medical malpractice case against Dr. Hizon. The purpose of taking the additional evidence was to obtain a credit for workers' compensation benefits paid pursuant to Iowa Code section 85.22(1), which provides:

> If compensation is paid the employee . . . under this chapter, the employer by whom the same was paid, or the employer's insurer which paid it, shall be indemnified out of the recovery of damages to the extent of the payment so made, with legal interest, except for such attorney fees as may be allowed, by the district court, to the injured employee's attorney or the attorney of the employee's personal representative, and shall have a lien on the claim for such recovery and the judgment thereon for the compensation for which the employer or insurer is liable.

■ If a court finds additional evidence is material and the party seeking to supplement the record has shown a good reason for not presenting it before the agency, the court is to remand the matter to the agency for a new determination. *Zenor v. Iowa Dep't of Transp.*, 558 N.W.2d 427, 431 (Iowa App.1996).

■ Evidence is "material" if it is "reasonably capable of influencing an agency's decision." *Interstate Power Co. v. Iowa State Commerce Comm'n*, 463 N.W.2d 699, 702 (Iowa 1990). In this case, the claimant contends our decision in *Toomey v. Surgical Services, P.C.*, 558 N.W.2d 166 (Iowa 1997), precludes Humboldt Schools from obtaining such a lien, so any evidence to support the claim for a lien is not material.

*Toomey* considered whether a workers' compensation carrier could assert an Iowa Code section 85.22(1) lien against an employee's recovery in a medical negligence action against the physician who treated the employee's injury. We held it could not, for policy reasons, *Toomey*, 558 N.W.2d at 170, and invited the legislature to respond if it believed this result would have an "adverse effect . . . on employers and their workers' compensation carriers and then act, or not, as it deems appropriate concerning future cases." The legislature has not acted to negate the ruling of *Toomey*. We hold that, under *Toomey*, the evidence sought to be added to the record was not material because the tort recovery could not be subjected to the employer's lien in any event. The district court therefore did not abuse its discretion in denying the request to supplement the record. Of course, Humboldt Schools' failure to obtain a *lien* under section 85.22(1) will not deprive it of its underlying claim for indemnity; the lien and the right to indemnification are separate matters. *See Shirley v. Pothast*, 508 N.W.2d 712, 717 (Iowa 1993); *Armour–Dial, Inc. v. Lodge & Shipley Co.*, 334 N.W.2d 142, 145 (Iowa 1983).

**AFFIRMED.**